In re Lawrence G. WILLIAMS, Debtor.

CITIBANK, N.A., Plaintiff,

v.

Lawrence G. WILLIAMS, Defendant.

Lawrence G. WILLIAMS, Plaintiff,

v.

CITIBANK, N.A., Defendant and Third Party Plaintiff,

v.

Diana B. WILLIAMS, Third Party Defendant.

Bankruptcy No. 90–12125.
Adv. Nos. 91–1055, 91–1068.

United States Bankruptcy Court, D. Rhode Island.

Oct. 8, 1993.

---

Andrew S. Richardson, Boyajian, Harrington & Richardson, Providence, RI, for Lawrence G. Williams.

Thomas D. Ruane, Lisa A. Carey, Robinson, St. John & Wayne, Newark, NJ, Paul W. Goodale, Adler Pollock & Sheehan Inc., Providence, RI, for Citibank, N.A.

Henry W. Swan, Davis, Kilmarx, Swan & Kohlenberg, Providence, RI, for Diana B. Williams.

ARTHUR N. VOTOLATO, Bankruptcy Judge.

The hearing on the merits of this adversary proceeding extended over six days during December 1992 and January 1993, on creditor Citibank's complaint against the Debtor, Lawrence Williams, seeking determinations of: (1) nondischargeability of debt pursuant to 11 U.S.C. § 523(a); (2) denial of discharge based upon 11 U.S.C. § 727; and (3) fraudulent transfer of property to Williams' wife, Diana, pursuant to §§ 544 and 548 of the Bankruptcy Code. The Debtor counterclaimed under 11 U.S.C. § 547 for the recovery of $106,305 paid to Citibank within ninety days of his bankruptcy filing.

By way of introduction, we think this case epitomizes the rise of aggressive entrepreneurs during the high flying 1980's, and, together with the economy, the fall of many of them by the end of the decade. Specifically, this litigation concerns: a Four Million Dollar loan to Lawrence Williams by Citibank to finance the purchase of an investment banking firm called Davidge & Company; the Williams' lavish enjoyment of the fruits of that enterprise, while it lasted; the sudden collapse of Davidge & Company; the divorce of Larry and Diana Williams; and the transfer of virtually *all* of Larry Williams' personal property to his nondebtor ex-wife, on the eve of his bankruptcy. As the cornerstone of his case, Williams asks us to believe that, one day out of the blue, Diana announced her intention to seek a divorce, that he *never* spoke to her about the subject, either before or after "the announcement," that he immediately vacated their multimillion dollar house, and *voluntarily* transferred to her all of their marital property which was then valued in excess of *$2 Million*, all while he was in debt to the tune of over Six Million Dollars.[1] The specifics of these contentions are discussed in detail below. However, we mention them preliminarily for all concerned to gain an appreciation of the big picture, and to prepare and forewarn them of how far-fetched are most of the positions advanced herein by Lawrence and Diana Williams.

I. *FINDINGS OF FACT*

A. *Background*

Lawrence Williams is well educated,[2] experienced, and was, until recently, extremely successful in the investment banking world. From at least 1983 through 1990, he was earning in excess of $800,000, and more like $1 Million a year. He is sixty-one years old, has been married twice and has four children. Diana married Lawrence in 1983 at age thirty-one, having been herself married once before, is also sophisticated and knowledgeable in corporate/financial matters. When she married Williams, Diana was employed with Metromedia, Inc. earning $213,000 per year. At the time of their divorce in 1990, she had just started

---

1. $4 Million owed to Citibank and approximately $2 Million in disputed debt owed to the Internal Revenue Service.

2. Williams holds a Bachelor of Science Degree in Finance from Syracuse University, and a Masters Degree in Finance from New York University School of Business.

working for the Abernathy–MacGregor Group in New York City at a salary of $100,000, and as of December, 1992 was earning in excess of $150,000. There was one child of this marriage, a son, and he is now six years old. Based upon all of the evidence, we find both Lawrence and Diana to be experienced and sophisticated in the business world; both are familiar with and have a comprehensive understanding of financial statements;[3] and both were intimately acquainted with and knowledgeable about the financial considerations that are the basis of Citibank's complaint.

### B. *The Pre-loan Activity*

The Citibank–Williams' saga begins in September 1988, when Lawrence, who was interested in acquiring Davidge, contacted Sally French,[4] a Newport social acquaintance employed with Citibank's Private Banking Division ("PBD") which caters to the banking needs of wealthy people.[5] Williams needed $4 Million to purchase Davidge, and in support of the loan application he initially provided French with (1) financial data relating to Davidge; and (2) a personal financial statement which he had submitted in December 1986 to the Bank of New York ("BONY"), with which he had long time ties.[6] This financial statement shows that a $2,535,000 loan by BONY to the Debtor was secured by municipal bonds valued at $3,100,000, and that the security was in the possession of BONY. In that statement, Williams also lists a 100% ownership in Wyndham, his mansion in Newport, which he valued at $4,250,000.

In evaluating the proposed Davidge purchase, French sought the assistance of

Richard Pike, a Vice President in Citibank's investment banking group. Mr. Pike was very favorably impressed, and based upon three different formulas indicating values ranging from $7 Million to $9.8 Million, he found Williams' $5 Million negotiated purchase price to be a "bargain." The evidence also reveals that Sally French was quite smitten with Williams' past achievements as well as his earning potential. In an internal bank memo, she stated:

> Larry Williams is a prospect. I have known him for three years in Newport, R.I. He bought and renovated one of the big old houses and filled it with old masters paintings. He is a very quiet, precise individual. He is considered a perfectionist in the renovation of his house. He has also attracted a lot of investment business from the old money in Newport.
>
> For the last year, Larry has been looking for an investment counselling operation to augment his broker dealer operation in NYC and to give him a vehicle to handle the apparent need for good investment advice. He has qualified as a buyer for Davidge and Company, an investment counselling firm in Washington and a Fleet Bank subsidiary. His initial proposal to Fleet was a purchase price of $1MM for Davidge and $4MM for the Davidge accounts (asset purchase). Davidge accepted his offer, subject to several things.
>
> Larry has asked us to finance the purchase. The cash flow, on a no growth basis, based upon '86 figures, can support a $4MM loan. The Company itself could be resold for $8MM–$10MM according to Dick Pike, VP, in our investment research group. Dick Pike is the

---

3. Williams testified that for thirty years a large part of his work consisted of analyzing financial statements for the purpose of advising clients on business decisions.

4. A key area of Ms. French's responsibilities involved seeking out and bringing in clients who qualified for the Private Banking Division of Citibank. When she met Williams, she immediately targeted him as a potential client and pursued him at a dinner party, referring to him (and others similarly situated) as "meat for Citibank."

5. PBD is comprised of three financially delineated tiers: Tier I requires a minimum $5 Million net worth; Tier II covers $2 to $5 Million in net worth; and Tier III is "below that amount."

6. In fact, Williams' business career started at the Bank of New York in 1957 when he was employed as a security analyst in the brokerage industry.

analyst who follows Banks, Brokerage and Investment Counselling operations for Citibank.

(Citibank's Ex. 67.)

To supplement the application, French requested an updated financial statement and, on November 3, 1988, Williams forwarded one to her. Although there is disagreement about whether, prior to receiving the financial and cash flow statements, French advised Williams that he was verbally approved for a $4 Million loan,[7] we believe that at most this was a conditional approval and that all written materials furnished to the bank prior to the issuance of the approval memorandum were relevant to the decision to make the loan, and were relied upon by Citibank. We reject Williams' argument that the economic strength of Davidge was the basis of the bank's decision to grant the loan and that his personal financial condition was irrelevant. We find that Citibank was relying upon the financial wherewithal of Williams *as well as* the value of Davidge.

The question requiring the most serious attention, however, is the reasonableness of Citibank's reliance, in light of the scant due diligence it conducted, and in its almost blind acceptance of the unverified information supplied by Williams.

### 1. *The Financial Statement*

In his November 3, 1989 financial statement to Citibank, Williams failed to disclose that the municipal securities, valued at $2.7 Million, were pledged to BONY as security for its $3.1 Million loan, along with the mortgage on his home, and we find that this concealment was deliberate, and not an oversight. Larry Williams is perhaps the *most* sophisticated businessperson to appear before this Court in defense of the accuracy of a financial statement and, with that background, the luxury of claiming ignorance, misunderstanding or mistake is just not available to him. This is true also, regarding his tax problems, wherein Williams failed to list a potential $2 Million tax liability on his financial statement under the heading "contin-

gent liabilities." His (unacceptable) explanation is that he interpreted the phrase to mean "known liabilities," or ones that are in existence at the time. We, however, are unable to equate "contingent" with "known liability" and find that, at a minimum, Williams had an obligation to inform the bank about (1) the open nature of his tax exposure; (2) his several tax shelter problems and any pending or potential litigation; and/or (3) to inquire about the meaning of "contingent liability," *if* he truly was confused by the term.

On this same financial statement, Williams listed all of the personal property, valued at $2.2 Million, as solely his property, and not as jointly owned with his wife, Diana. This property includes jewelry, artwork, silver, crystal, antiques and other valuables, and his explanation for not listing the property as jointly owned was that he "did not think of it"! In rejecting this excuse as ludicrous, we wish that all issues of fact could be resolved as easily as this one. We find that this omission was intentional and deliberately intended to mislead and deceive Citibank by bolstering his net worth for the purpose of obtaining the $4 Million loan. Overall, Williams' financial statement and cash flow projections were quite primitive for one whose profession and livelihood consists of scrutinizing and analyzing the accuracy of technical and complex financial documents of others. Because of his experience, Williams is held to a higher standard of knowledge in these matters than more ordinary people.

Moreover, Diana Williams reviewed her husband's financial statement and never questioned the veracity of his representation that he owned all of the personal property outright. In fact, her testimony was that she had no specific recollection of discussing the contents of the document with Larry, but that she remembered feeling "very pleased with the bottom line." She also stated that she was not specifically aware that Larry was including all items of personal property in the statement, but that "she wouldn't be surprised"—that she "didn't think of the items separately" and

---

**7.** Williams eventually negotiated the purchase price down from $5 Million to $4 Million.

that it "never occurred to her to divide things in her mind." These are not the words, either, of one who specializes in analyzing and advising on financial matters for private clients, and Diana's attempt to appear as a naive and uninvolved spouse at home is inconsistent with the facts, and is rejected. At the time in question, Diana was extremely interested that Larry obtain the Citibank loan to purchase Davidge and, by failing to correct or comment on omissions or misrepresentations in his financial statement, Diana was a knowledgeable participant and co-conspirator in the delivery of false information to Citibank. According to Mary Agnes Pan ("Pan"), the bank officer who assumed the management of this loan when French left Citibank shortly before the closing, Diana was actively involved in all of the negotiations surrounding the loan transaction, and was present with Williams at all relevant times. We accept this characterization of Diana Williams as accurate.

### 2. *Lack of Due Diligence*

Williams fares better on the issue of reliance, however. Curiously, Sally French opted not to perform any type of credit check on Williams before recommending this loan for approval. In fact, while she was talking to an agent of BONY about this very loan application, French didn't even bother to inquire whether the municipal bonds were pledged. Moreover, Mr. Williams was never asked to furnish an inventory of the art and antiques, or to have the personal property appraised. Instead, French relied exclusively on Larry's personal opinion of the value of such items, as reported in his financial statement. French recommended the loan for approval despite Williams' failure to provide her with many requested documents, including copies of the BONY mortgage and accompanying loan documents. This was so because, in her words, Williams "had integrity" and was a person of great substance whom she had known for years. French also admitted that because of Williams' net worth, it was not, in her opinion, necessary to bother with a credit check. She ex-

pressed, in no uncertain terms that loan applicants in lower income brackets are not extended this same deference, but are required to provide verification of their representations—not the case with customers in Tier I of Citibank's PBD during the 1980's.[8] These "people of substance can be taken at their word," and that is exactly what Sally French did with Williams. The same sentiment was echoed by Pan, who reaffirmed that "banks rely on a [Tier I] client's word." This high society (and incomprehensible) approach to evaluating whether to approve loans running into the millions of dollars is clearly a business option available to private bank divisions, but leaves them little room to complain, vis-a-vis reliance, when these loans go sour.

### C. *The Loan Closing*

The closing was held on March 10, 1989, between Citibank and Investment Management Group ("IMG"), a company formed by Williams to take title to Davidge, and although Williams personally guaranteed the loan, no collateral was given to secure that guaranty. And, as previously mentioned, no independent due diligence was undertaken to ascertain the strength of the guaranty. Also under the terms of the Loan Agreement, Williams was required to maintain two affirmative covenants: (1) that his net worth exceed $7 Million at all times, and (2) that he maintain liquid assets of $2 Million at all times.

Diana testified that she didn't remember discussing Larry's personal liability on the $4 Million note, but, again, in light of her professional background and expertise, this contention is rejected. We find that Diana Williams was fully aware of Larry's personal liability, and that both of them fully understood the significance and potential consequences of the guaranty.

Simultaneously with the granting of the Loan, IMG merged with Davidge, Davidge became the surviving corporation, and Williams, as the owner of all of the outstanding stock of Davidge, pledged the stock to Citibank as collateral. In both the

---

**8.** French acknowledged that the lending climate in the 1980's was more liberal than at present.

loan agreement and the guaranty, Williams averred that all of the information supplied to the bank in support of the loan was true, complete and accurate, and with respect to the guaranty, he agreed that the liquid assets (i.e. the municipal bonds) "must be free from any pledge." This very significant representation was not true at the time it was made, and he knew it.

### D. *The Refinancing*

Approximately eight months later, in November 1989, for tax purposes, Williams decided to substitute himself, personally, as the principal obligor and to name Davidge as the guarantor. Williams also requested that the bank delete the covenants regarding his net worth and liquid assets, and submitted an updated financial statement in support of these requests. At this time, Davidge was doing exceedingly well and by Williams' calculations, the business was worth $6.5 Million. Although Diana couldn't recall the circumstances under which she reviewed the updated financial statement, she did remember thinking that "things had gone very well since the last one."

The updated financial statement, however, again fails to disclose either the pledge of the municipal bonds to BONY, or his contingent tax liability. And once again, the statement clearly leads one to believe that all of the personal property is owned by Larry Williams outright, and makes no reference to any property being jointly owned with Diana. Based upon all of the evidence, we find that Williams intentionally misrepresented (1) the ownership of the personal property; (2) the secured status of the bonds; and (3) his contingent tax liability.

Not surprisingly, again Diana did not question Larry's representation that he owned all of the personal property, nor did she question his failure to disclose the pledge of the municipal bonds, and her testimony that she was not aware of the bond pledge is rejected. As noted earlier, Diana is very astute and Wall Street-wise, and we simply do not believe that she was oblivious to whether a $2.7 Million liquid asset was pledged or not. Instead, we find as a fact that Diana was fully aware of the accuracy of Larry's representations, that she never, until now, disagreed with or even questioned them, and that, as in the original loan, she was a knowledgeable participant in misleading Citibank in the restructuring. As we indicated earlier, both Diana and her counsel's attempts to present her as an innocent victim of her husband's poor business judgment, unaware and unfamiliar with the details and complexity of the situation, are contrary to the reality in this proceeding.

We find, based upon all of the evidence, that Citibank relied upon Williams' revised financial statement, which was false in many respects, as well as on the representations in the loan documents themselves, in agreeing to restructure the loan and in deleting the financial covenants. Again however, we find that the bank's reliance was not reasonable, given its failure to conduct even a minimum amount of due diligence to verify what Larry Williams was telling her.

### E. *The Collapse of Davidge*

Things went well until July 1990, when Davidge collapsed, essentially due to a mass defection by its key investment managers, who were not obligated by contract to either stay with Davidge or not compete.[9] No one disputes that Williams notified Citibank immediately about this situation, and that he was cooperative with the bank in responding to its inquiries and requests. On August 7, 1990, a little late, to put it mildly, representatives of Citibank, John Swett ("Swett") and Peter Fudge ("Fudge"), met with Williams and requested additional security, and expressed concern that he keep the loan current. Citibank also asked Williams to submit an updated financial statement and a proposal for restructuring and/or providing addi-

---

**9.** In hindsight, this, no doubt, is the reason Larry was able to work such a "bargain" on the purchase price of Davidge.

tional security for the loan, and he agreed to do so.

Thereafter, on August 17, 1990, Williams informed Swett that he was negotiating an agreement to sell to Fiduciary Trust Company International ("Fiduciary") the right to pursue Davidge's clients and that he would receive a fee for assisting Fiduciary in this regard. Williams offered to assign his right to these fees to Citibank, and to also give a mortgage on Wyndham and a security interest in his personal property. While Williams was thus occupied, Diana, and Ms. Pan from Citibank arranged for an inspection of the contents of Wyndham to be conducted on August 24, 1990. In anticipation of this visit, Diana agreed to prepare an inventory of the items to be available for inspection. It was clearly Citibank's expectation that *all* of the personal property located at Wyndham was to be included in this list, and would be given as additional collateral.

### F. *Diana's Involvement*

Prior to the collapse of Davidge, Diana was willing to share completely in the fruits of that venture, but thereafter took the position that it was Larry who "was in financial difficulty and that he was making every effort to settle those problems" and that she "was willing to help him." We have difficulty reconciling the notion that when things were going well and her husband was earning in excess of $1 Million a year, that Diana was a co-owner and partner in all of the wealth and success generated through Larry's skill and competence as the breadwinner in the family. Then, when their fortunes took a turn for the worse, Diana treated the problems as *exclusively* Larry's, and from that point forward "divorced" (pun intended) herself from Larry's financial and tax problems, as well as from the bond of marriage. In light of subsequent events as they eventually became known, Diana was very instrumental in diminishing what personal property Williams had to offer Citibank on ac-

count of his multi-million dollar loan obligation.

With what we now know, it is not surprising that prior to Citibank's visit to inspect the art and antiques, Diana, unilaterally and without notice to anyone, removed many of the items of value from Wyndham. Unabashedly, she testified that she did this so as "not to confuse Citibank" as to whose property was whose. Diana testified that the property was removed between the time of Pan's telephone call and Citibank's inspection, and that she told neither Larry nor the bank about the removal. Also, at about this same time, Diana told Larry that she wanted a divorce. According to Diana, she and Larry had been talking about a divorce for many months. Larry testified, however, that the news came as a complete shock and that he "almost fell out of my chair" when she announced it at the office of attorney Joshua Angel, whom they were consulting with respect to "Larry's financial situation" since Davidge's collapse. The reason Diana gave for removing the property was that she was getting a divorce; it was her property; and that she did not know what Citibank would do when they came. She admitted however, that when Larry's financial statement was being prepared and presented to the bank it did not occur to her that Citibank might be confused by what property belonged to whom, and it was not until Larry's financial problems surfaced that Diana publicly announced that all of the personalty was hers.[10]

When Pan and Marcus visited Wyndham, Diana, deliberately we find, concealed the fact that she had removed certain valuable property, as well as the fact that she and Larry were in the process of being divorced and negotiating a property settlement.

### G. *The Fiduciary Agreement*

During August, 1990, Williams and Citibank continued negotiating to restructure the loan, and to finalize the agreement with Fiduciary for the sale of the client list and

---

**10.** Diana also admitted that she never had a discussion with Larry as to whose property was whose, notwithstanding that most of what she removed was property purchased during the marriage, with Larry's earnings.

the assignment of proceeds to Citibank. We reject the bank's contention that the agreement between Williams and Fiduciary came into existence before the paperwork was finalized and executed. Rather, during this interim period, the parties were engaged in the normal give and take that goes on before any agreement is reached, and we disagree that during this bargaining stage, an enforceable agreement was then in place, subject only to later memorialization. We acknowledge that for Citibank this result is unfortunate, since Williams very likely had the preference dates in mind when he was negotiating with the bank on the eve of his bankruptcy filing.[11] Unfortunately, and however reprehensible this may appear, it does not alter the law as we see it, nor change the facts as they have been presented to us.

### H. *The Divorce Proceedings*
#### 1. *The Affidavit*

Especially damaging to Williams in this tangled web of events is that during the time he was negotiating with Citibank to restructure the loan, he was also in the midst of divorce proceedings,[12] including the execution of an affidavit dated September 12, 1990, wherein he certified that he was *not* the owner of personal property he had previously vowed to Citibank was his. Based upon all of the evidence, especially the inconsistencies exhibited by him during this period,[13] we find that Williams intentionally concealed the fast moving divorce proceedings, wherein he was disclaiming ownership of most of the personal property he had previously listed as his assets. Clearly, these divorce/bankruptcy shenanigans were done with the intent to hinder, delay and defraud Citibank, by placing substantial assets beyond its reach. In fact, Diana testified that the affidavit was prepared as a "legal way to ensure it was her property before the divorce proceedings began." This is in sharp contrast to her lack of concern with the legal ownership of the property when approval of the loan application was her top priority, and when it was in their joint interest to satisfy the bank that all of the property belonged to Larry.

■ Citibank's matrimonial expert, Richard Galli, Esq., testified that the affidavit prepared by Andrew Davis, Esq., signed by Williams, and which purports to vest ownership in most of the assets with Diana *prior to* any divorce agreement being reached, is wholly inconsistent with the normal Family Court practice in Rhode Island and, is, in his words, "an aberration." We agree with this assessment and also find that Williams' contention that he executed the document without consulting counsel or discussing it with Diana is ridiculous, and bolsters our belief that the affidavit is nothing more than another device intended to hinder, delay and defraud Citibank. Moreover, the Debtor's failure to call his divorce lawyer to testify as to the circumstances leading to the execution of the affidavit is construed against him, and in support of the bank's position. *See In re Colonial Bakery, Inc.*, 108 B.R. 13, 15 (Bankr.D.R.I.1989); *In re Fraza*, 143 B.R. 584 (Bankr.D.R.I.1992).

#### 2. *Williams' Notice to the Bank and Offer to Settle*

It was not until September 17, 1990 (after executing the affidavit), that Williams first advised Citibank of the divorce proceedings *and* of the Internal Revenue Service's potential $2 Million claim against him. Williams made this disclosure at this time to try to force the bank to forgive a

---

**11.** Citibank has argued, and we agree, that Williams and his counsel relied upon, and in fact, held over its head, the preference deadline in connection with its decision to file bankruptcy, in an attempt to procure a settlement with the bank.

**12.** Although Diana Williams actually filed the divorce complaint on September 21, 1990, the process began in late August—early September, when she retained matrimonial counsel who, on September 12, 1990, forwarded Williams an "Affidavit of Agreement as to Property Ownership," for his signature.

**13.** Williams was simultaneously offering all of his personal property to Citibank, if it would get him out of the loan, while executing an affidavit in the divorce proceeding averring that this very same property belonged to Diana.

significant portion of its claim against him. This strategy was not successful, however, and on October 29, 1990, Citibank filed suit in Rhode Island against Williams. It was not until the process server went to Wyndham to serve the complaint on Williams that Citibank learned for the first time that the parties were in fact already divorced.

Williams makes much of the fact that on September 17, 1990 (five days *after* he executed the affidavit declaring that personal property valued in excess of $440,000 [14] was Diana's), he offered Citibank all of the personal property plus the equity in Wyndham (although he never obtained Diana's agreement to do this, or even discussed the issue with her), but that the bank rejected the offer because of its confidence in his future earning power. In effect, Williams attempts to equate the offer to Citibank with his property settlement agreement with Diana, but this comparison is disingenuous at best. The interests and rights of Citibank and Diana against Williams cannot be likened to each other. Citibank had a contractual right to expect that Williams' debt to it would be paid in full—either out of present assets or future income, and it was under no obligation to accept less than complete payment. Diana, on the other hand, was not a creditor of Larry's, but was his wife, and any claims she had against him were unliquidated and quite nebulous, i.e. Diana and Larry shared a collective marital estate that, in a contested divorce, would be equitably divided after close scrutiny. To characterize Citibank's rejection of Williams' offer as a "right of first refusal," making it then available for transfer to Diana, is silly, and was in no way a license to convey all of his personal

property to Diana, and beyond the reach of Citibank. Thus, the Debtor's contention that by rejecting Larry's "offer," (which we find to be illusory [15]) Citibank is precluded from arguing fraudulent intent, is rejected.

### 3. *The Fast Track Divorce*

Diana and Larry obtained a divorce in less than two months, from start to finish, and the Court finds this astonishing, considering the size of the marital estate, and the fact that Larry did not even engage matrimonial counsel until October 10, 1990. The speed with which this divorce was concluded can only be construed as additional proof of Larry and Diana's scheme to put virtually all of their property out of the reach of Citibank. We further find, as argued by the bank, that Larry's matrimonial *and* bankruptcy attorneys and Diana's lawyers were coordinating their efforts to effectuate the best possible deal for their respective clients, at the expense of Citibank. This conclusion is inescapable given the nature and timing of events as they have unfolded here. Moreover, Diana herself testified that she was aware that the issue of bankruptcy was being constantly discussed during this time period.

On or about October 10, 1990, Williams retained DeWitte Kersh, Esq. as his matrimonial counsel, and within 15 days a Property Settlement Agreement was reached.[16] Under this Agreement, Diana was awarded all of the personal property previously described and represented to Citibank as the sole property of Larry Williams. In addition, she was awarded half of the equity in Wyndham, half of the joint checking account, custody, and child support of $5,000

**14.** The values ascribed on the first two pages of the affidavit were given by Diana, based upon her recollection of the purchase price of these items. Without more reliable evidence as to the accuracy of these values, we make no finding in that regard.

**15.** Also, lest we forget, Larry never had Diana's agreement to make such an offer.

**16.** Both Diana and Larry testified that they did not speak to one another during this time but that all of the property settlement negotiations were conducted by their respective counsel. Ac-

cordingly, they say, neither of them could shed any light on how the eventual agreement, which basically conveyed *all* of the personal property to Diana, was reached. Curious then that neither one called their attorney to testify as to the legal and factual reasons which gave rise to the eventual agreement. We find this to be a crucial void in the record and can only conclude that such testimony, if presented, would have been unfavorable to them, and would in many respects contradict the testimony of Larry and Diana Williams. *See In re Fraza*, 143 B.R. 584 (Bankr.D.R.I.1992).

per month. In further anticipation of his impending bankruptcy filing, Larry agreed to pay, up front, six months child support, or $30,000. Diana argues that she had also requested alimony, child education, and tax liability indemnification as part of the agreement, but that these requests were rejected, and in exchange she received substantially all of the personal property.

On October 25, 1990, Diana executed the Property Settlement Agreement, and five days later Larry signed it. The Agreement was presented to the Family Court on October 30, 1990, and simultaneously, the parties executed a waiver of the statutory sixty day waiting period. They needed the waiver purportedly because of Diana's new employment which would be taking her out of state. This explanation, while convenient, is not the true reason for the waiver. Rather, these parties sought the quickest possible way to obtain a divorce and to transfer out Williams' property before Citibank learned of their plans or moved to attach the property. We base this finding on the totality of the circumstances as we view them.

Also during this time frame, Williams was attempting to work out his financial problems with BONY. On September 18, 1990, he submitted to that bank an updated financial statement, which he had prepared with the assistance of Joshua Angel, Esq. In this statement, Williams falsely reported that he was the 100% owner of Wyndham, even though he had conveyed a one half interest to Diana in 1989. In addition, Williams valued his personal property *at that time* at $1,550,000. Within one month of submitting that statement, Williams transferred substantially all of this property [17] to Diana, supposedly in lieu of a potential alimony award. Williams contends that he *never* discussed alimony with his matrimonial attorney; that they never engaged in an analysis of a potential alimony award to Diana; nor the consequences of

the collapse of Davidge, his liability to Citibank, or Diana's new job prospects. Instead, Williams testified that it was Kersh's suggestion to simply transfer the personal property to Diana, and that he went along with this, without question, thinking it was a great idea. This explanation is simply not to be believed, and Williams' failure to call Kersh to corroborate his testimony on this point solidifies our disbelief of his story.

It is our conclusion that this property transfer was made in contemplation of bankruptcy, was known to all concerned (except Citibank), and was made with the intention of relieving himself of all possible alimony exposure, figuratively at least, with other people's money. As will be discussed *infra*, we think it most unlikely, absent collusion, that Diana would have received a substantial alimony award, particularly in light of the large agreed upon child support payment, and her recent employment at such a handsome salary, by anyone's standards.

In the divorce proceeding, Larry Williams submitted to the Rhode Island Family Court a Statement of Assets, Liabilities, Income and Expenses dated October 22, 1990, commonly called a DR-6. Notably absent from this statement is any reference to Williams' $4 Million liability to Citibank, or any references to bankruptcy, or IRS problems.[18] No reasonable explanation was given for these omissions and we find that the exclusion was intentional, to avoid alerting the Family Court to what was really going on between the parties. Even Diana's matrimonial expert, Gerald McIntyre, Esq. conceded that the Family Court would want to know about the existence of large loans and would allocate "the good with the bad" with respect to assets and liabilities, and he acknowledged that Williams' DR-6 was not "fairly thought through or prepared." Based upon what we find was Williams' real in-

---

**17.** The only things Williams retained were the furnishings from his New York apartment, worth $17,000, and $42,500 from their ($85,000) joint checking account—just a little less than his six year old son's allowance for one year.

**18.** At a contested Family Court hearing, the judge would have heard plenty about bankruptcy, and about Lawrence Williams' financial condition.

tention, we believe that his DR–6 was indeed "fairly thought through," with the specific purpose of misleading the Family Court as to the actual financial condition of the parties. Williams' testimony that he wasn't sure whether his divorce lawyer even knew about this obligation is rejected as incredible. Williams previously testified that he retained Messrs. Boyajian and Kersch at about the same time, and to now suggest that these two attorneys were unaware of each other's doings or of the extent of Williams' financial woes, is not worthy of belief. Such testimony further discredits Williams' veracity and for this reason, except as otherwise specifically referenced herein, all disputed issues of fact are resolved against him.

Although the Debtor and Diana would depict a wholly different picture of their financial situation in the Fall, 1990, suffice it to say that the evidence leaves Williams with a questionable future earning capacity,[19] no substantial employment prospects, and a present debt load of $4 to $6 Million. Diana, on the other hand, had no personal liability to Citibank and had just obtained employment at a starting salary of $100,000, with the expectation (which has already occurred) of an increase to $150,000 in a very short time. In view of this, as well as the various relevant factors discussed below, we accept the opinion of attorney Galli that it is extremely unlikely that Williams would have been hit with a substantial alimony award. Though the parameters used in his matrixes were not entirely consistent with the facts as they developed at trial, we agree conceptually with his theory of determination and, independently of his testimony but based upon all of the relevant facts, find that a large alimony award was remote. This conclusion is based upon: (1) the parties' actual earnings (Diana—$100,000 to $150,000/ year vs. Larry—approximately $250,000); (2) the fact that Diana required no employment rehabilitation; (3) the relatively brief duration of the marriage—seven years; (4) Williams agreement to pay child support of $60,000 per year;[20] (5) that neither side bore any culpability for the break up; and finally, (6) Williams' $4 Million liability to Citibank, and maybe a shared $2 Million liability to the IRS. Given these factors, we conclude that Williams did not face serious risk of a substantial alimony obligation, and that his property settlement with Diana was not within the range of what a *fully informed* Family Court Judge would order, after a contested hearing.

The testimony of Mr. McIntyre does not alter this ruling. Although he feels that the property settlement was very favorable for the Debtor, we find his reasoning that, despite the $4 Million Citibank debt, an award of alimony was possible based upon the Debtor's prior earnings[21] and "what the wife gave up," to be on weak ground. The fact that Diana chose to remain at home was not, in our opinion, any real sacrifice on her part.[22] On the contrary,

19. We find it also relevant that Williams is 61 (compared with Diana's 42 years), and the steadfast, joint insistence of the parties that he will continue to earn $1 Million a year indefinitely, is quite problematic.

20. We find this alone to be an almost dispositive factor. Many complete families of four do not have this much income, and to seriously contend that Diana, while earning in excess of $100,000, and receiving this substantial child support payment, should also be entitled to a large alimony award, is not reasonable in the circumstances. In addition, her attorney, Henry Swan, has argued that the child care expense was being shared by the parties. If this is true, then Diana would also be contributing $48–60,000 per year for the support of one child. It is hard to imagine that a six year old requires $100–120,000 per year (even allowing $24,000 a year for his nanny) for "support."

21. This conclusion is somewhat inconsistent with Mr. McIntyre's earlier testimony that he was "not suggesting that the Court would order alimony based upon Williams' past earnings—just that there is that potential."

22. McIntyre's contention that Diana left the work force for an eight year period and was responsible for the care and "the support" of the couple's child is a mischaracterization, at best. As indicated above, Diana's decision not to work outside the home during this time was hers alone, and is probably a choice any spouse, male or female, would envy. Moreover, it is erroneous to suggest that Diana was responsible for the "support" of their son. During this time Williams was earning in excess of $800,000 a year to support his wife and child.

Diana was willing to enjoy the luxuries of Williams' accomplishments, and in doing so she was entirely within her rights—but we hardly consider this to militate in favor of an alimony award. In addition, that she contributed her savings ($350,000) and gave up future stock options in furtherance of the marriage is not very compelling, when compared with what Williams put into the home renovations and the marriage in general.[23]

Had either Swan or Kersch testified as to the negotiations that *must* have taken place, and why the result was deemed reasonable, we might at least have had the opportunity to reach a different conclusion. However, neither one appeared, and we conclude that their testimony would have been unfavorable to the interests of their clients in this litigation. *See In re Colonial Bakery, Inc.*, 108 B.R. at 15; *In re Fraza*, 143 B.R. 584.

Citibank was unaware on October 29, 1990 that the following day, October 30th, Lawrence and Diana would be submitting their Property Settlement Agreement to the Rhode Island Family Court for approval. Soon thereafter, Williams' bankruptcy counsel, John Boyajian, Esq., contacted Citibank and advised of Williams' intention to file bankruptcy if a settlement could not be worked out. True to his word, when Citibank demanded full payment, on December 3, 1990, Williams filed his Chapter 11 petition in this Court.

## II. *CONCLUSIONS OF LAW*

### A. *11 U.S.C. § 523(a)—Nondischargeability of Debt*

■ The burden of proof under § 523(a) is a preponderance of the evidence standard. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Hence, in order to have Williams' debt to Citibank declared nondischargeable under § 523(a)(2)(B), Citibank must establish that Williams obtained credit by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

In *In re Pretner*, 110 B.R. 942 (Bankr. D.Colo.1990), this Court, sitting by designation, endorsed the definition given in *In re Anzman*, 73 B.R. 156, 163 (Bankr.D.Colo. 1986) that material falsity in a financial statement can be premised upon

inclusion of false information or upon the omission of information about a debtor's financial condition. A financial statement which misrepresents the debtor's ownership of an asset or which does not disclose the true ownership of assets included within the debtor's property is materially false.

■ Here, it is clear that Williams misrepresented the ownership of his personal property, the status of the municipal bonds, and the contingent nature of his tax liability.

Based upon these easily made findings, we conclude that Williams made materially false representations in his original November 3, 1988 financial statement to Citibank, as well as in his updated October 25, 1989 statement. These misrepresentations concerned his financial condition and were made with the requisite intent to deceive the bank. "Such intent is usually never shown by direct evidence but can be inferred where a written statement is knowingly false or made with a reckless disregard for the truth." *In re Pretner*, 110 B.R. at 945 (citing, *Monroe Indus. Bank v. Wolf (In re Wolf)*, 67 B.R. 844, 849 (Bankr. D.Colo.1986)). Moreover, "the existence of fraud may be inferred if the totality of the circumstances present a picture of deceptive conduct by the debtor which indicates that he intended to deceive and cheat the

---

**23.** Diana testified that the renovations cost in the range of $1.5 Million and that she contributed $350,000 from her savings. Since the other $1.2 Million came from the Debtor, we cannot find that her contribution was overly significant in the circumstances.

creditor." *In re Monahan*, 125 B.R. 697 (Bankr.D.R.I.1991) (citing, *In re Fenninger*, 49 B.R. 307, 310 (Bankr.E.D.Pa.1985)) (other citations omitted). Intent is similarly established where "the applicant knows that the application contains falsities yet remains silent as to those falsehoods." *Id.* Williams fits within all of these definitions.

Having met four of the five criteria, Citibank is confronted with the final obstacle of establishing that its reliance on the information supplied by Williams was reasonable. "To sustain its burden of demonstrating reasonableness a lender must show that it exercised ordinary diligence with respect to the loan." *In re Pretner*, 110 B.R. at 942 (citing *In re Anzman*, 73 B.R. at 164) (other citations omitted).

█ We disagree with Citibank's argument, and the authorities in support, that unless confronted with glaring defects, there is no duty to conduct a minimum of due diligence to confirm the accuracy of information given in a financial statement.[24] Prudent and reasonable business practice, and this Court's own experience in hearing 25 years' worth of financial statement disputes, dictates that a credit investigation should be performed on *anyone* applying for a loan. Sally French conceded that Citibank performs such checks on loan applicants in lower financial brackets, but did not believe in verifying information supplied to it by individuals in the Tier I division of the PBD. This elitist rationale is nonsensical, to put it mildly, and the best proof of this is precisely what happened in this case, where it was made obvious that there is no difference between people such as Lawrence Williams and borrowers of ordinary means, when it comes to lending money. On the contrary, the fact that he was requesting $4 Million should have mandated a thorough credit investigation, espe-

cially when one considers that the procedure is initiated with only a telephone call. The failure to do so was an unreasonable but calculated risk for which the bank must now pay, at least as to this issue.

The evidence was conflicting as to whether Ms. French reviewed the statement (such as it was) line by line with Williams. On this point, we accept Williams' version that such a review was never conducted but that instead, French accepted the statement and thereafter informed him *at some point*, that he was approved for the loan. Therefore, the bank's argument that it had no reason to question the financial statements because Williams had verbally reaffirmed their accuracy is specious and is rejected. Having failed to establish the reasonableness of its reliance on Williams' financial statements, we conclude that Citibank has not met its burden under § 523(a)(2)(B) to have Williams' debt to it declared nondischargeable. Accordingly, that request is DENIED.

## B. *11 U.S.C. § 727—Denial of Discharge*

█ Citibank next argues that Williams should be denied a discharge pursuant to § 727(a)(2)(A).[25] To prevail under this section, the bank must establish that:

(1) a transfer of property has occurred;

(2) it involved property of the debtor;

(3) the transfer was within one year of the filing of the petition;

(4) the debtor had, at the time of the transfer, the intent to hinder, delay or defraud a creditor.

*In re Clausen*, 44 B.R. 41 (Minn.1984), and the burden is on Citibank to prove the requisite elements of § 727, by a preponderance of the evidence. *McGowan v.*

---

**24.** We also reject Citibank's argument that "it would be imposing the Court's judgment upon a lender's verification procedures, when the Bankruptcy Code 'was not intended to empower the court to undertake a subjective evaluation and judgment of a creditor's policies and practices.'" (Citibank Post Trial Brief, at 34 (citing *Harasymiw v. Selfreliance Federal Credit Union*, 97 B.R. 924, 929 (N.D.Ill.1989), *aff'd* 895 F.2d 1170

(7th Cir.1990))). Where a creditor's practices are deficient, it is precisely the task of the courts to make that determination. Otherwise, the element of "reasonableness" would be rendered meaningless.

**25.** This section is made applicable in Chapter 11 cases pursuant to 11 U.S.C. § 1141(d)(3)(C).

*Beausoleil (In re Beausoleil )*, 142 B.R. 31 (Bankr.D.R.I.1992); Fed.R.Bankr.P. 4005.

Our findings of fact *ante* confirm that the first three elements have been satisfied. Williams transferred property which he owned, or purported to own, within one year of his bankruptcy filing. Although the issue of ownership is certainly a disputed one now, based upon the collusive activities of both Williams to treat the personalty as owned solely by Larry at the time he was requesting the $4 Million loan, they are bound by this representation for purposes of the § 727 claim.

Thus, the only remaining issue is whether the transfer of substantially all of Larry's personal property [26] to Diana on the eve of his bankruptcy filing was done with intent to hinder, delay or defraud Citibank, and we conclude that it was. This result is inescapable, given the secrecy and dispatch with which the transfers were made, and the inferences drawn from Williams' continuing to negotiate with Citibank while concealing his contemporaneous divorce proceeding. We also find that the "badges of fraud" described in *In re Clausen*, 44 B.R. at 44, as indicative of such intent have been shown.[27] As discussed *ante*, we are satisfied that Diana's agreement to waive alimony does not constitute adequate consideration for the transfer to her of substantially all of the marital assets. It is obvious that Williams engaged in a deliberate strategy to slow down the bank, by making vague offers to settle and promises to provide information, all while he was engrossed in the clandestine transfer of all of his assets to Diana.[28] Larry's motivation to solve his matrimonial problems with assets that should have been available to pay his Citibank debt, is a transparent attempt to kill two birds with one stone. Clearly, the requisite intent has been established. For the foregoing reasons, Citibank's claim under 11 U.S.C. § 727(a)(2)(A) that Williams be denied a discharge is GRANTED.

### C.  *11 U.S.C. §§ 544 and 548—Fraudulent Conveyances*

Lastly, Citibank moves, pursuant to Bankruptcy Code §§ 544 and 548, for a determination that the transfers in question constitute fraudulent conveyances.[29]

Section 548(a) provides that:

(a) The trustee may avoid any transfer of an interest of the debtor in property . . . that was made . . . within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer . . ., and

*In re Clausen*, 44 B.R. at 44.

---

26. Which he valued at $2.2 Million in 1988 (*see* Ex. 1) and $1.55 Million in 1990 (*see* Ex. 29).

27. Citibank has demonstrated the following "badges of fraud" as being present in this case:

1) the lack or inadequacy of consideration;
2) the family, friendship or close associate relationship between the parties;
3) the retention or possession, benefit or use of the property in question;
4) *the financial condition of the party sought* to be charged both before and after the transaction in question;
5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
6) the general chronology of the events and transactions under inquiry.

28. This strategy was kept under such tight security that we still don't know what really went on, even after a six day trial. Larry and Diana Williams are not talking, and the attorneys with the first hand knowledge were kept out of court—their lips also sealed on this issue.

29. Citibank correctly points out that 11 U.S.C. § 544 allows a trustee to avoid certain transfers made by the debtor in violation of state law. Rhode Island's Fraudulent Transfer Act incorporates the same proof necessary to establish a claim under R.I.Gen.Laws § 6–16–1 as is required under Code § 548. Accordingly, we will not repeat our analysis herein with respect to Citibank's claim under § 544, but incorporate our findings and conclusions with respect to the bank's § 548 claim.

(B)(i) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer ...;

11 U.S.C. § 548(a).

Citibank contends that the transfers by Lawrence to Diana of virtually the entire marital estate, pursuant to the September 12, 1990 affidavit and Property Settlement Agreement, are fraudulent transfers under both of these subsections. We agree.

We need not repeat the factors supporting our ruling that Williams had the requisite intent to defraud the bank. The above findings of fact clearly demonstrate that, upon examination of all the indicia, Lawrence and Diana Williams, in a joint effort, intended to defraud Citibank when they entered into the Property Settlement Agreement. We find no merit or credibility in their shared argument that Larry was being confronted with a potentially large alimony obligation, given the facts as we have decided them above, and based upon our own independent evaluation of the remote chance of such an award.

We thoroughly agree with Citibank's analysis of Williams' scheme to transfer assets in anticipation of bankruptcy and in defraud of his creditors:

[A]ll of Williams' actions throughout the months of September and October 1990 evidence a well thought out pattern to deceive Citibank, as well as all of his creditors. His September 12, 1990 affidavit (Exhibit 28) was deceitful and done for no other purpose than to defraud creditors. The September 18, 1990 financial statement to the Bank of New York (Exhibit 29) was false. Exhibit 31, the one paragraph document referring to bankruptcy from Williams' matrimonial file, evidences his deceitful intent. Williams' DR6 form (Exhibit 32) was false. All of these documents indicate clearly the path he was following toward

bankruptcy. Their existence can only be explained as part of a grand scheme to transfer assets in anticipation of filing bankruptcy. Therefore, all such transfers and his actions evidence his intent to defraud creditors and are voidable under 11 U.S.C. § 548(a)(1).

(Citibank Post Trial Brief, at 38).

■■■ Under § 548(a)(2), we must decide whether Williams "received reasonably equivalent value" for the transfers. In divorce situations the test is whether (1) the transfer was bona fide; and (2) whether the value of the property transferred equals the value of what was received. In *Harman v. Sorlucco (In re Sorlucco)*, 68 B.R. 748, 755 (Bankr.D.N.H.1986), Judge Yacos used the following test for establishing the bona fides of a transfer:

It must be shown that the property division was a result of an arms-length bargaining in the light of the likely range of distribution that the divorce court might order if the matter went to a contested trial. Settlements reached in the shadow of an eminent bankruptcy filing would raise a clear factual question as to the bona fides of such bargaining.

We think the instant case falls squarely within this holding[30] and, in light of the timing of the divorce, the commencement of Citibank's suit against Larry Williams, and the date of the bankruptcy filing, the issue of fact as to the bona fides of the Property Settlement Agreement (as previously determined in the factual discussion above), is resolved easily against Williams. Moreover, as we also found *ante*, the terms of the Agreement are not within the likely range that a (fully informed) Family Court Judge would order.[31] We have previously ruled that Diana's waiver of alimony in return for virtually all of the personal prop-

---

**30.** Judge Yacos aptly enunciated the factors to be considered in passing on the bona fides of a property settlement agreement, and it is only his eloquence that we borrow herein, since the facts in *Sorlucco* bear no resemblance to the instant proceeding.

**31.** As has been referenced elsewhere in this opinion, Larry and Diana Williams not only needed to defraud Citibank in order to accomplish their dual objectives—they also were required to, *and did,* mislead the Rhode Island Family Court in order to obtain its approval of the property settlement agreement.

erty was not of equivalent value,[32] and therefore conclude that Citibank has established the elements necessary to avoid the transfers under §§ 544 and 548.

Accordingly, Citibank's request that the transfers of personal property to Diana, within one year of his bankruptcy filing, be avoided pursuant to 11 U.S.C. §§ 544 and 548, is GRANTED.

### D. *11 U.S.C. § 547—Preferential Transfers*

■■■ Lastly, we consider the Debtor's claim that Citibank received a preferential transfer of $106,305, pursuant to the assignment of Williams' agreement with Fiduciary.

The factors necessary to establish a § 547 claim are well known, and in this instance, the parties agree that the only two elements in dispute are: (1) whether the assignment occurred within the ninety day preference period, and (2) whether the assignment improved Citibank's position as a creditor. We conclude that Williams has satisfied the first element, but not the second.

The parties argue strenuously over the effective date of the assignment to Citibank. Based upon our findings of fact detailed above, the assignment did not come into existence, and therefore was not enforceable, until sometime after September 2, 1990. This brings the transfer within the ninety day statutory preference period, and therefore Williams has satisfied this element of his claim.

We are not satisfied, however, that the Debtor has met his burden under § 547(b)(5). Both sides argued at length over whether Citibank remained a secured

creditor in the Fiduciary payments. This Court agrees that with respect to the sale of any of Davidge's clients or client lists, that Citibank's security interest in the Davidge stock would extend to those assets. However, we do not agree that Citibank's security interest also extends to the services rendered by Williams in coordinating the sale of assets, or in agreeing to a noncompetition agreement. Thus, it would seem that, at most, Citibank's secured interest only extends to an undivided portion of the assignment proceeds, and no evidence has been offered to establish what that percentage might be.

Nevertheless, the issue can be disposed of on a different ground. Even if we assume, without deciding, that Citibank was *unsecured* as to these payments, based upon the lack of evidence regarding the value of Williams' estate upon liquidation, we are unable to make any determination as to whether Citibank received more by the transfers than it would have received in a Chapter 7 liquidation.

The only attention to this point by Williams is a statement in his post trial brief that "[b]ecause of the IRS claim, Citibank would not have received any of those funds in a Chapter 7 liquidation." (Williams Proposed Findings of Fact and Conclusions of Law, Feb. 16, 1993, at 42.) However, it is a matter of record in this Court that the Williams' IRS claim is in dispute, is being aggressively contested, and has been characterized by Larry Williams' tax attorney as not having much merit. Thus, the evidence is insufficient for us to conclude, as a matter of law, that this claim will result in no funds being available for Citibank. We have been admonished once before by the District Court

**32.** The other two grounds relied upon by Diana as supporting the good faith of the transfers are that the Debtor had refused her request for tax liability indemnification and that he pay for their child's education. First of all, we are not satisfied that Lawrence Williams is solely responsible for any tax liability, but view this as very likely a joint marital liability. The fact that he invested in tax shelters for their joint benefit is irrelevant. Diana would have had a joint tax liability with her husband in any event and the fact that she agreed to let him make

their tax decisions does not relieve her of possible liability. She certainly received and accepted the benefit of any unpaid tax obligation while they were married. *Additionally,* Williams' refusal to sign on to a stated obligation for educational expense for his son is insignificant. That he agreed to pay $60,000 per year for his child's support evidences his intent to be responsible and indeed generous regarding his parental commitments. Again, we do not agree that this is an obligation that a family court judge would likely order after a trial.

that although " 'actuarial certainty' is not required in determining any preferential amount, any calculation based on this figure [outdated appraisal values] borders on speculation." *Max Sugarman Funeral Home, Inc., E.M.B. Associates, Inc. and Jason Monzack, Trustee v. A.D.B. Investors,* 127 B.R. 508, 512 (D.R.I.1989). So too in this case, it would also be speculation to conclude that, because of a disputed IRS claim, Citibank received more by these transfers that it would have received in a Chapter 7 liquidation. Accordingly, Williams has failed to prove this element of his preference claim and his request for the disgorgement of $106,305 must be DENIED.

## III. *CONCLUSION*

In summary, based upon the foregoing discussion, findings of fact, and conclusions of law, the respective claims of the parties are disposed of as follows:

1. Citibank's claim that its debt to Williams be deemed nondischargeable under 11 U.S.C. § 523(a)(2)(B) is DENIED;

2. Citibank's claim that Williams be denied a discharge under 11 U.S.C. § 727(a)(2)(A) is GRANTED;

3. Citibank's claim that Williams' transfer of substantially all of his personal property to his former wife, Diana, constituted Fraudulent Conveyances under 11 U.S.C. §§ 544 and 548 is GRANTED;

4. Williams' claim that the transfer of $106,305 to Citibank pursuant to the assignment was preferential under 11 U.S.C. § 547(b) is DENIED.

Enter Judgment consistent with this opinion.