**UNITED STATES of America,**
Appellee,

v.

**James Arthur JOHNSON, Defendant,**
**Appellant.**

**UNITED STATES of America,**
Appellee,

v.

**John P. CAMPBELL, Defendant,**
**Appellant.**

**Nos. 72–1108 and 72–1109.**

United States Court of Appeals,
First Circuit.

Heard Sept. 8, 1972.

Decided Oct. 11, 1972.

Certiorari Denied Jan. 22, 1973.
See 93 S.Ct. 963.

Manuel Katz, Boston, Mass., with whom Paul T. Smith, Boston, Mass., was on brief, for James Arthur Johnson, appellant.

Lawrence F. O'Donnell, Boston, Mass., with whom Francis X. Aylward, Boston, Mass., was on brief, for John P. Campbell, appellant.

Henry H. Hammond, Asst. U. S. Atty., with whom Joseph L. Tauro, U. S. Atty., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and HAMLEY,* Senior Circuit Judge.

McENTEE, Circuit Judge.

These are appeals from two convictions entered upon a two count indictment for selling and conspiring to sell counterfeit currency. Count I of the indictment charged appellant Johnson and one McGovern with selling counterfeit Federal Reserve notes in violation of 18 U.S.C. § 473 (1970).[1] Count II charged appellant Campbell with conspiring with Johnson and McGovern to sell counterfeit notes in violation of 18 U.S.C. § 371 (1970). After trial by a jury all three defendants were found guilty as charged. Only Johnson and Campbell appeal.

On Friday, November 13, 1970, Secret Service Special Agent Daniel Marchitello and Edward Callahan, a government informant, drove to a cafe in Charlestown, Massachusetts. They entered the cafe at 12:30 p. m. and found appellant Johnson inside. Within Marchitello's hearing Callahan asked Johnson, "Have you got the stuff?" Johnson replied, "No. I haven't seen the guy but I'll have it for you tomorrow at approximately 12:30 p. m." Shortly thereafter Marchitello and Callahan left the cafe.

The next day Marchitello and Callahan returned to the cafe at approximately 12:30 p. m. Johnson, who was there, engaged Callahan in a brief private conversation. When Callahan walked back to Marchitello, he gave him three counterfeit $10 Federal Reserve notes which he said Johnson had just given him. Marchitello then left the cafe and returned to the car. A few minutes later Callahan and Campbell emerged from the cafe and approached Marchitello. Campbell told Marchitello that these counterfeit notes were very "hot" in Boston because they were being dipped in coffee to give them a used appearance and because merchants were detecting them as counterfeit because of the coffee smell. Campbell suggested that Marchitello use cigarette ashes and starch to age the bills. He said that the

---

* Of the Ninth Circuit, sitting by designation.

1. 18 U.S.C. § 473 provides, "Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

price would be $20 per hundred and promised a lower price if Marchitello purchased in large quantities. He then asked the agent how many notes he wished to buy. Marchitello told him that he wanted to purchase $2,000 in counterfeit bills and Campbell promised to have the consignment ready at 3 o'clock that afternoon.

At approximately 3:05 p. m. Marchitello and Callahan returned to the cafe. They went in and sat down at the bar. Johnson and McGovern were present. After a brief conversation between Callahan, Johnson, and McGovern the latter approached Marchitello. He told him that the price would be $175 per thousand and asked Marchitello how much money he wanted to purchase. Marchitello said he wanted $2,000 in counterfeit currency and indicated that in the future he would place orders by calling the cafe and using the words "dresses or sweaters" to mean counterfeit money. McGovern agreed that the use of a code word was a good idea and said that he could be contacted by calling the cafe and asking for either himself or "Barney" (referring to Johnson). McGovern then walked over to Johnson and returned with a small brown paper bag. He told Marchitello that the bag contained $3,000 in counterfeit currency and again asked him how much currency he wanted. Marchitello told him $2,000. McGovern then removed one package of bills from the bag and handed the bag to Marchitello, whereupon the latter left the cafe and counted the bills. He discovered a shortage of $20, returned to the cafe, and told McGovern of this shortage. McGovern walked over to Johnson and returned with two more counterfeit $10 notes. Marchitello then paid McGovern $350.

McGovern promised Marchitello a lower price in future transactions if he bought in larger quantities, and offered specially printed serial numbers if the agent bought $100,000 worth. Marchitello gave McGovern an undercover phone number at the New York Secret Service office where he could be reached and left the cafe.

Thereafter on approximately six other occasions from December 1970 through March 1971 Marchitello called the Charlestown cafe. On each occasion he spoke to "Barney" (Johnson), and asked him whether any "sweaters" were available. Johnson said no "sweaters" were available and on one occasion stated that he had Marchitello's phone number and would call if any turned up.

At the close of the government's case all of the defendants rested and moved for judgment of acquittal on both counts. The court denied these motions and submitted the case to the jury. The defendants were found guilty as charged.

On appeal Johnson urges three grounds on which his convictions should be overturned. He argues first that the trial court erred in admitting into evidence without any limiting instructions hearsay declarations of his codefendants, second that the evidence was insufficient to warrant sending the case to the jury, and third that the trial court erred in instructing the jury with respect to the government's failure to call the informant Callahan as a witness. Campbell attacks his conviction on the latter two grounds raised by Johnson.

Specifically Johnson first argues that the jury may not consider statements made by his codefendant in his absence against him unless there is independent evidence offered which establishes that in fact Johnson was an active participant in the alleged conspiracy. He raises this contention with regard to the admission of Marchitello's conversation with Campbell in the early afternoon of November 14, 1970, and with regard to Marchitello's conversation with McGovern in the cafe later that same afternoon. The record demonstrates that Campbell's remarks were admitted without limiting instructions and that while the court initially gave the limiting in-

structions with regard to McGovern's conversation, it later reversed itself and told the jury that it might consider this conversation with respect to all of the defendants. For reasons stated below, we find this contention without merit as to both conversations.

■ Little need be said with regard to the admission of Marchitello's conversation with Campbell without limiting instructions because this evidence could not possibly have been prejudicial to Johnson. The latter was neither mentioned nor referred to in any manner in this conversation, nor did he raise any objection to the admission of this testimony at trial.

■ The admission of Marchitello's conversation with McGovern without limiting instructions was also proper. The declaration of one co-conspirator is inadmissible against a second alleged co-conspirator who was not present when the declaration was made, absent independent proof that the second co-conspirator is connected with the conspiracy. Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Once such independent evidence of participation in the conspiracy has been established, however, the hearsay declaration becomes admissible against the alleged co-conspirator. Gorin v. United States, 313 F.2d 641, 651 (1st Cir.), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963). Discretion is vested in the trial court to determine whether sufficient credible independent evidence has been offered to render the hearsay declarations admissible. The independent evidence need not establish the alleged co-conspirator's participation beyond a reasonable doubt. Such statements are admissible if the trial court finds the independent evidence credible and sufficient to support a finding of concerted action. United States v. Ragland, 375 F.2d 471, 477 (2d Cir.), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968).

■ We find ample independent evidence in the record to support the court's conclusion that Johnson was a participant in the conspiracy and thus to render McGovern's declarations admissible as to Johnson. Johnson promised on November 13, 1970, to have the "stuff" ready the next day about 12:30 p. m. When Marchitello and Callahan returned to the cafe at that time, Callahan delivered three counterfeit $10 notes to Marchitello after a short conversation with Johnson. Also, after the initial transaction on November 14, 1970, Marchitello and Johnson spoke to each other several times by phone and discussed counterfeit money using the code word "sweaters." We note, however, that Marchitello proposed the use of this code word to McGovern only. During one of these calls Johnson also said that he had Marchitello's New York phone number. Here, also, it is to be noted that Marchitello had given this phone number to McGovern only. These circumstances provide sufficient independent evidence of Johnson's participation in the conspiracy to render McGovern's declarations admissible against Johnson.

■ Appellants' contention that the evidence was insufficient to warrant sending the case to the jury is without merit. The record demonstrates with regard to Johnson that his opening remark to Marchitello and Callahan on November 13 initiated the events of November 14; that Callahan gave Marchitello three sample counterfeit notes after a brief private conversation between himself and Johnson; that Callahan told Marchitello that Johnson had just given him these three notes; that McGovern walked over to Johnson and then returned carrying a paper bag containing counterfeit money; that after being told of the $20 shortage, McGovern walked over to Johnson and returned with two additional counterfeit notes; and finally, that Marchitello telephoned and discussed with Johnson a number of times the possible purchase of additional counterfeit money (using the code word "sweaters").

With regard to Campbell, the record shows that on November 14, 1970, he

told Marchitello that the counterfeit notes were very "hot" in Boston because they were being dipped in coffee to age them; that Marchitello should age them by rolling them in ashes and pouring starch over them; that the price would be $20 per hundred, but would be lower if Marchitello purchased larger quantities; and that he would have Marchitello's consignment of counterfeit notes ready for him at 3 p. m. that same afternoon.

Viewing these facts in the light most favorable to the government, Parker v. United States, 378 F.2d 641, 644–645 (1st Cir.), cert. denied sub nom. Perma-Home Corp. v. United States, 389 U.S. 842, 88 S.Ct. 81, 19 L.Ed.2d 107 (1967), we find the facts to be more than sufficient to support the court's decision to submit both counts to the jury.

Appellants' final contention that the court erred in its instructions to the jury with regard to the government's failure to call informant Callahan as a witness is equally without merit. In closing argument counsel for each defendant urged the jury that it might infer from the government's failure to call Callahan that his testimony would have been unfavorable to the government's case. In response, the prosecution requested supplementary instructions to the effect that Callahan was equally available to both sides and that the jury could draw whatever inferences it chose from the government's failure to call him. The record indicates that throughout the trial Callahan was incarcerated in Massachusetts and that while the government attorney had informed defense counsel at least one month before trial and again on the first day of trial that he would not be called as a government witness, defense counsel made no attempt to have him produced.

On these facts the court instructed the jury as follows:

"During the course of the trial there has been some mention of an alleged informer by the name of Calla-han. The defendants' counsel have argued to you that the jury should draw an inference from his absence that his testimony would be unfavorable to the government. There is evidence that Mr. Callahan is currently in jail. I would, however, point out to the Jury that each of the defendants would have a right, as does the government, to compel or to ask the Court to compel the presence of Callahan as a defense witness. In other words, the defendants, as well as the government have the right to compulsory process to obtain the presence of witnesses.

"I will leave it to you, having pointed this out, to draw such inferences as you wish, if any, as to what the absence of this witness shows or does not show with relation to the government's case.

"I would emphasize, however, that the defendants have no duty to present any evidence and the government has the duty of proving the case beyond a reasonable doubt."

The basis for either argumentative comments or request for instructions with regard to an opponent's failure to call a knowledgeable witness is the simple proposition that if a party has evidence which will illuminate questions in issue and fails to present it, it may be inferred that such evidence would be harmful to his case. 2 Wigmore on Evidence § 285 (3d ed. 1940). No inference is permissible, however, where the unpresented evidence would be merely cumulative, United States v. Llamas, 280 F.2d 392, 393–394 (2d Cir. 1960), or where the evidence is equally available to either party. See Graves v. United States, 150 U.S. 118, 121, 14 S. Ct. 40, 37 L.Ed. 1021 (1893).

It is the government's position that because Callahan was in jail in Massachusetts throughout the trial he was equally available to both parties. Citing United States v. D'Angiolillo, 340 F.2d 453 (2d Cir.), cert. denied, 380 U.

S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965) and United States v. LaRocca, 224 F.2d 859 (2d Cir. 1955), the government argues that no inference may be drawn against it for its failure to call the informant. We refuse to accept this proposition. A witness's availability is not to be decided on the basis of his physical presence in the court room or his accessibility by writ of habeas corpus or by subpoena. We hold rather that a witness's practical and legal availability is to be determined on the basis of his disposition and relationship toward the parties. McCormick, Law of Evidence § 249, at 534 (1954). *See, e. g.,* United States v. Jackson, 257 F.2d 41, 43–44 (3d Cir. 1958); McClanahan v. United States, 230 F.2d 919, 925–926 (5th Cir.), cert. denied, 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956); Samish v. United States, 223 F.2d 358, 365 (9th Cir.), cert. denied, 350 U.S. 848, 76 S.Ct. 85, 100 L.Ed. 755 (1955); United States v. Beekman, 155 F.2d 580, 584 (2d Cir. 1946). Where the court finds that an uncalled witness is clearly favorably disposed toward one of the parties, an instruction, if requested, may properly be given that the jury may draw an inference favorable to the other party, *Llamas, supra.* In those cases where the bias or disposition of an uncalled witness is not able to be ascertained, "the failure to produce is open to an inference against both parties, the particular strength of the inference against either depending on the circumstances." (Emphasis deleted.) 2 Wigmore on Evidence § 288, at 171 (3d ed. 1940).

Our endorsement of these principles, however, does not require the reversal of the convictions below. Here the court's instructions left the jury free to draw what inferences it might from the government's failure to call Callahan. The fact that the instruction pointed out that Callahan could have been made available to be called by the defense is offset to some degree by the emphasis in the instruction on drawing inferences "with relation to the government's case." While a more appropriate instruction would have spelled out Callahan's hostile disposition toward the defense, on balance we find the court's instruction to have been a neutral one which did not vitiate defense counsel's missing witness argument to an extent substantial enough to constitute reversible error.

Affirmed.