940 F.2d 663
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Johnny Ray JONES and John Glen Jones, Defendants-Appellants.
 Nos. 90-6137, 90-6138.
 United States Court of Appeals, Sixth Circuit.
 Aug. 6, 1991.
 
 Before BOYCE F. MARTIN, Jr. and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants-appellants Johnny Ray Jones and John Glen Jones, who are brothers, appeal their jury convictions for possession of marijuana with intent to distribute and carrying on the business of a retail dealer in beer without paying the special tax imposed on dealers by statute, violations of 21 U.S.C. Sec. 841(a)(1) and 26 U.S.C. Sec. 5691(a), respectively.
 
 
 2
 In these appeals, the principal issues presented by Johnny Ray Jones are (1) whether the district court erred in failing to sever his trial from his brother's trial, and (2) whether there was insufficient evidence to support his convictions. The principal issues presented by John Glen Jones are (1) whether the district court erred in refusing to sever Count I of the indictment from the other counts, (2) whether there was insufficient evidence to support his convictions, (3) whether the district court erred in refusing to give a missing witness instruction, and (4) whether the district court erred in failing to grant a new trial. For the reasons that follow, we affirm.
 
 I.
 A.
 
 3
 On July 31, 1989, undercover officer Jimmy Phelps, a Kentucky State Trooper, drove to the last residence "up Gregory Branch" (in Clay County, Kentucky, near Manchester) and purchased $30 worth of marijuana. Later, at the trial, Phelps identified defendant John Glen Jones as the individual who personally sold him the marijuana. At the time Phelps made the purchase, an informant sat in the passenger seat of Phelps' automobile.
 
 
 4
 According to Phelps, the residence, which he later learned to be the home of defendant Johnny Ray Jones, was operated like a drive-in. Before Phelps made the purchase, he waited in line behind other customers, and others waited in line behind him. While he waited, Phelps observed John Glen Jones sell beer and marijuana to several other patrons. According to Phelps, when it came his time for service, John Glen Jones asked what Phelps wanted. Phelps responded, "A $30 bag," whereupon John Glen Jones turned around, snapped his fingers, and was given a $30 bag from someone on the front porch of the residence.
 
 
 5
 On August 1, 1989, Phelps returned to the residence to purchase beer. John Glen Jones was present on this occasion but did not make the sale. Instead, the purchase was made from a young man who was making deliveries to the car windows on a bicycle. The young man rode to a small barn a short distance away from the residence and returned with beer. Phelps also observed that some sales were apparently supplied from inside the house.
 
 
 6
 On August 3, 1989, surveillance officers watched the residence for approximately thirty minutes and observed fourteen different vehicles travel to and from the residence and complete some type of transaction with a young man on the bicycle. One of the officers was able to observe that some of these transactions involved the sale of beer.
 
 
 7
 On August 4, 1989, Officer Gary Harris and others traveled to the place where Phelps had made the purchase and executed a search warrant on the Johnny Ray Jones residence. When officers arrived, Johnny Ray Jones was sitting on the porch of his residence in a position where he could see anything that was going on in front of the house. Johnny Ray's brother, John Glen Jones, was not at the residence at the time the search began, but "came out of the woods" near the time the officers were getting ready to leave.
 
 
 8
 "Off to the right of the residence" officers found three large bags of marijuana that contained a total of 64 small bags, packaged identically to the marijuana purchased on July 31, 1989. Approximately 250 feet from the residence, officers found four large bricks of marijuana weighing a total of 7,077 grams buried in a metal container. The officers also seized approximately 700 cans of beer across the road from the residence hidden near a small barn under an old farm trailer. Paths led from the residence to the places where the contraband was hidden.
 
 
 9
 At the close of the government's case, defendants moved for judgments of acquittal. Additionally, Johnny Ray Jones renewed a motion for severance of his trial from that of his brother on the ground that Count I of the indictment did not involve him and prejudiced his case. John Glen Jones also renewed his motion for severance of Count I from the other counts. The district court denied the motions for judgments of acquittal and for severance.
 
 
 10
 Defendants' evidence consisted mainly of attempting to show that John Glen Jones was with a friend turtle hunting instead of at the Johnny Ray Jones residence on July 31, 1989. Additionally, defendants introduced evidence that footpaths from where the contraband was discovered on August 4, 1989, led to places other than the Jones residence, particularly to a heavily traveled road located only a short distance away.
 
 B.
 
 11
 Although the indictment contained seven counts, only four were submitted to the jury. Count I charged only John Glen Jones with possession with intent to distribute marijuana in connection with the July 31, 1989, sale to undercover Officer Phelps. Counts II and III charged that the brothers, aiding and abetting each other, possessed with intent to distribute the bagged and brick marijuana found during the raid of August 4, 1990. Count VI charged that, aiding and abetting each other, the brothers carried on the business of a beer retailer without paying the special tax imposed by 26 U.S.C. Sec. 5121.
 
 
 12
 Before the case was submitted to the jury, defendants asked for a "missing witness" instruction which would have allowed the jury to draw an adverse inference against the government based on its failure to call as a witness the informant that was present with Officer Phelps. The district court declined to give the instruction but allowed defendants to comment during closing arguments upon the government's failure to call the informant. The jury found both defendants guilty of the crimes charged.
 
 
 13
 Shortly after the trial, defendants discovered the identity of the informant, Kenneth Merril, and took a sworn statement from the informant to the effect that he was present with Officer Phelps on July 31, 1989, and defendant John Glen Jones was not the man who made the sale to Officer Phelps. Based on this "newly discovered evidence," defendants filed a joint motion for a new trial. The district court held an evidentiary hearing on the motion on August 20, 1990. During that hearing, informant Merril recanted his earlier sworn statement and gave testimony consistent with that of Trooper Phelps. Accordingly, the district court denied the motion for a new trial. On August 21, 1990, the district court entered judgment including sentence, followed by amended judgments on August 27, 1990. Timely notices of appeal followed.
 
 II.
 A. Severance
 
 14
 Defendant Johnny Ray Jones argues that the district court should have severed his trial from the trial of his brother. Defendant John Glen Jones argues that the district court should have severed his trial on Count I from the other counts. The district court's ruling on a severance issue is reviewed for abuse of discretion. See, e.g., United States v. Swift, 809 F.2d 320, 322 (6th Cir.1987).
 
 
 15
 Joinder of multiple offenses against the same defendant is allowed if the charges "are based ... on two or more acts or transactions ... constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a). "Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in ... the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). Rule 14 of the Federal Rules of Criminal Procedure allows relief from prejudicial joinder through severance of the defendants or counts.
 
 
 16
 Although defendants frame the issue in terms of severance, their arguments indirectly challenge the initial joinder. Since the evidence in this case permits the conclusion that Count I was part of a common scheme or plan further exposed on August 1, August 3, and August 4, 1989, there was no error in joining the counts or the defendants. See Fed.R.Crim.P. 8; United States v. Johnson, 763 F.2d 773, 776 (6th Cir.), cert. denied, 474 U.S. 862 (1985) (using "common scheme" language in regard to multiple defendants).
 
 
 17
 Turning directly to the severance issue, we note that the general preference is for joint trials. The party seeking severance must
 
 
 18
 carry the "heavy burden of showing specific and compelling prejudice resulting from a joint trial which can be rectified only by separate trials." ... [T]he error requires reversal only "if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict."
 
 
 19
 United States v. Davis, 809 F.2d 1194, 1207 (6th Cir.) (citations omitted), cert. denied, 483 U.S. 1007 (1987).
 
 
 20
 Defendants' arguments of prejudice are based on the erroneous assumption that evidence relevant to Count I would have been excluded in separate trials on the other counts. The evidence of drugs passing from the porch of Johnny Ray Jones' residence was relevant to link him to the possession of the contraband. See United States v. McGhee, 882 F.2d 1095, 1099 (6th Cir.1989); United States v. Carter, 486 F.2d 1027 (6th Cir.1973), cert. denied, 416 U.S. 937 (1974). Likewise, evidence that John Glen Jones was dealing in drugs on July 31, 1989, was relevant to his possession of contraband seized on August 4, 1989. Thus, we find no prejudice to the defendants in their joint trial including Count I. See United States v. Bibby, 752 F.2d 1116, 1123 (6th Cir.1985), cert. denied, 475 U.S. 1010 (1986).
 
 
 21
 Furthermore, the danger of prejudice was minimized by the district court's instructions to separately consider the evidence as it related to each offense and defendant. See Swift, 809 F.2d at 323. Accordingly, the district court did not abuse its discretion in failing to sever the defendants or the counts.
 
 B. Sufficiency of the evidence
 
 22
 Both defendants challenge the sufficiency of the evidence to support their convictions on Counts II, III, and VI. When a criminal conviction is challenged on the ground of insufficient evidence, the reviewing court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). A conviction can stand on circumstantial evidence alone, and that evidence need not "remove every reasonable hypothesis except that of guilt." Id. at 328.
 
 
 23
 Rather than challenge any particular element, both defendants essentially argue that there is nothing to link them with the contraband. In evaluating these arguments, we bear in mind that the evidence indicates that the Johnny Ray Jones residence was the headquarters of the busy drug and alcohol marketplace. The operation obviously required that a supply be located nearby, and the fact that paths led from the residence to the places where the contraband was stored strongly suggests that the drugs and alcohol belonged to the defendants.
 
 
 24
 This inference is strengthened by Officer Phelps' testimony that John Glen Jones sold drugs to him in a package that turned out to be identical to the packaged marijuana which formed the basis of Count II of the indictment. John Glen Jones was present on August 1, 1989, and was seen "coming out of the woods" on August 4, 1989, when the contraband was found.
 
 
 25
 Johnny Ray Jones was linked to the contraband by testimony that the drugs purchased on July 31, 1989, came from someone on the porch of his residence, and by testimony that sales on August 1, 1989, were supplied from the porch and inside the residence.[1] Moreover, the evidence indicates that while Johnny Ray Jones kept a watchful eye from the porch of his residence on the morning of August 4, 1989, numerous transactions occurred. In fact, the beer from one aborted transaction taking place almost under the nose of Johnny Ray Jones was seized on the morning of the raid.
 
 
 26
 In sum, although the evidence was largely circumstantial, it was sufficient to support a reasonable trier of fact in the conclusion that defendants Johnny Ray Jones and John Glen Jones jointly possessed, either actually or constructively, the contraband named in Counts II, III, and IV of the indictment. Moreover, the evidence was sufficient for a reasonable juror to conclude that Johnny Ray Jones aided and abetted his brother by making his residence available for marijuana and beer sales.
 
 C. Missing witness instruction
 
 27
 Defendant John Glen Jones argues that the district court committed reversible error in failing to give a missing witness instruction. Whether or not to give such an instruction is left "in large part" to the discretion of the trial court. E.g., United States v. Blakemore, 489 F.2d 193, 195 n. 4 (6th Cir.1973); see United States v. Frost, 914 F.2d 756, 766 (6th Cir.1990).
 
 
 28
 Fulfillment of a two-part test is necessary before an adverse inference can be drawn from the failure of [an opposing] party to call a witness: 1) the witness must be "peculiarly within [the opposing party's] power to produce," and 2) the witness' testimony would "elucidate the transaction." Frost, 914 F.2d at 765.
 
 
 29
 The cases placed the burden of proving these prerequisites on the party asking for the missing witness instruction. See United States v. Romo, 914 F.2d 889, 893 (7th Cir.1990), cert. denied, 111 S.Ct. 1078 (1991); United States v. Johnson, 562 F.2d 515, 517 (8th Cir.1977) (per curiam); see also Frost, 914 F.2d at 765. Defendant failed to carry the burden of showing that the informant was available to and producible by the government. This failure was apparently the basis of the district court's ruling.
 
 
 30
 Assuming arguendo that the witness was available to the government, defendant John Glen Jones also failed to show that the informer's testimony would have elucidated the transaction rather than being merely cumulative. See Romo, 914 F.2d at 893; United States v. Mahone, 537 F.2d 922, 927 (7th Cir.), cert. denied, 429 U.S. 1025 (1976); United States v. Tyres, 487 F.2d 828, 831 (2d Cir.1973), cert. denied, 416 U.S. 971 (1974); United States v. Johnson, 467 F.2d 804, 808 (1st Cir.1972), cert. denied, 410 U.S. 909 (1973). Although the informant, when discovered by defendants, gave a statement which was contradictory to Officer Phelps' testimony, at the time of its ruling the district court could have only found that the informer would have elucidated the transaction by speculating that the informer would have given testimony exculpatory to the defendant (contrary to the representations of the government's counsel). See United States v. Adamo, 882 F.2d 1218, 1231-32 (7th Cir.1989) (speculation not sufficient).
 
 
 31
 Moreover, even if it was error to refuse the missing witness instruction, the error was harmless in this case. See United States v. Burton, 724 F.2d 1283, 1293 (7th Cir.1984); see also Blakemore, 489 F.2d at 196 n. 5. As an alternative to the missing witness instruction, the district court allowed defendants' counsel to comment during closing argument upon the government's failure to call its informant. See Johnson, 467 F.2d at 809 (failure to give an instruction was harmless error because the neutral instruction did not eviscerate defense counsel's missing witness argument); Yumich v. Cotter, 452 F.2d 59, 64 (7th Cir.1971), cert. denied, 410 U.S. 908 (1973).
 
 D. New trial
 
 32
 Finally, defendant John Glen Jones argues that the district court committed reversible error in failing to grant a new trial on the basis of newly discovered evidence; i.e., the informant's sworn statement that John Glen Jones was not the person from whom Officer Phelps purchased marijuana on July 31, 1989.
 
 
 33
 A district court's determination that a new trial is not warranted by newly discovered evidence will not be reversed absent "clear abuse of discretion."
 
 
 34
 The following elements must be established before a new trial will be granted:
 
 
 35
 (1) the new evidence was discovered after the trial;
 
 
 36
 (2) the evidence could not have been discovered earlier with due diligence;
 
 
 37
 (3) the evidence is material and not merely cumulative or impeaching; and
 
 
 38
 (4) the evidence would likely produce an acquittal.
 
 
 39
 United States v. O'Dell, 805 F.2d at 637, 640 (6th Cir.1986) (citations omitted), cert. denied, 484 U.S. 859 (1987).
 
 
 40
 The district court held a hearing in which the informant recanted his sworn statement made to the defendants and gave testimony consistent with Officer Phelps'. From the district court's discussion of the informant's testimony at the hearing and the worth of his earlier sworn statement to defendants, it appears that the sworn statement given by Merril to the defendants was neither material (as opposed to impeaching) nor likely to produce an acquittal. Accordingly, the district court did not abuse its discretion in denying the motion for a new trial.
 
 III.
 
 41
 For the reasons stated, the judgments of the district court are AFFIRMED in all respects.
 
 
 
 [1]
 The evidence linking the contraband to the Johnny Ray Jones residence distinguishes the present case from United States v. White, 932 F.2d 588 (6th Cir.1991), relied upon by defendant Johnny Ray Jones. In White, this court overturned a conviction for possession of marijuana where "the only evidence linking White to the marijuana was the fact that he lived three feet from the patch." Id. at 589. "The actual cultivator of the patch was unknown," and "overgrowth ... between the [residence] and the patch" plus "White's disability and apparent immobility" weighed heavily against any inference that White was the cultivator or owner of the patch. White, 932 F.2d at 590. Although Johnny Ray Jones, like White, did not own the property where the contraband was found, paths led from the residence to the contraband, whereas, in White, "there was no path between the residence and the patch." Id. at 590