In re Lawrence G. WILLIAMS, Debtor.

CITIBANK, N.A., Plaintiff,

v.

Lawrence G. WILLIAMS, Defendant.

Lawrence G. WILLIAMS, Plaintiff,

v.

CITIBANK, N.A., Defendant and Third–Party Plaintiff,

v.

Diana B. WILLIAMS, Third– Party Defendant.

Civ. A. No. 94–0250ML.

United States District Court, D. Rhode Island.

Jan. 16, 1996.

---

Paul W. Goodale, Providence, RI, Thomas Ruane, Lisa Carey, Robinson, St. John & Wayne, Newark, NJ, for Citibank, N.A.

Andrew S. Richardson, Providence, RI, for Lawrence G. Williams.

Gordon P. Cleary, George M. Vetter, Jr., Providence, RI, for Diana B. Williams.

## MEMORANDUM OPINION

LISI, District Judge.

This matter is before this court on the appeals of the Debtor, Lawrence G. Williams,

and the third-party defendant, Diana B. Williams, from a decision of the United States Bankruptcy Court for the District of Rhode Island. Appellant Lawrence G. Williams avers that the Bankruptcy Court erred by (1) misapplying the missing-witness inference; (2) denying a discharge according to 11 U.S.C. § 727(a)(2)(A); (3) ruling that certain conveyances of property between him and his wife constituted fraudulent transfers according to 11 U.S.C. §§ 544 and 548; and, (4) determining that he failed to meet his burden to set aside a preference pursuant to 11 U.S.C. § 547. Appellant Diana B. Williams joins Lawrence G. Williams in his allegations of error concerning the application of the missing-witness inference and the §§ 544 and 548 determinations of fraudulent transfers.

## Introduction

Before this court begins its factual summary and legal analysis, a brief foreword is necessary to introduce the parties and the environment in which their testimony was taken. Citibank is a national banking association with a reputation that needs no further amplification. Lawrence G. Williams (Lawrence)[1] has a bachelor's degree in Finance, a master's degree in Business administration and a long history of success in the investment-securities industry. During the late 1980's Lawrence's annual income was approximately $1,000,000.

Diana B. Williams (Diana) has a bachelor of arts in Greek and Latin. Before marrying Lawrence, Diana was employed by Metro Media, Inc., as a vice president of corporate and financial communications at an annual salary in excess of $250,000.[2] Prior to her position with Metro Media she was employed by Chemical Bank as an investment analyst.

The Williamses were married, each for the second time, on July 15, 1983. At the time of the marriage Lawrence was 51 years old and Diana was 31. Also at that time, Lawrence owned "Wyndham," a twenty-room-stone residence located on twelve acres in Newport, Rhode Island. Lawrence and Diana have one son, Andrew, born January 6, 1988.

In or about November, 1988, Lawrence obtained a four million dollar loan from Citibank. Lawrence's default on that loan set the stage for the bankruptcy proceeding and this appeal. The bankruptcy trial extended over six days, resulting in 1,100 pages of transcript and the admission of an abundance of exhibits[3] of multi-page documents. A review of the trial testimony reveals a record fraught with inconsistencies in testimony, memory loss, and a lack of specificity regarding certain very important dates and events.

This court has scrutinized the record and determines that it need not reiterate the facts that led to the loan and the incidents which occurred subsequent to the demise of Lawrence's investment business. The bankruptcy court's summary of the facts, *see In re Williams*, 159 B.R. 648, 650–60 (Bankr. D.R.I.1993), represents a relatively clear picture of the parties and a correct chronology of events. As will be discussed in more detail below, however, because of certain erroneous evidentiary rulings, some of the factual determinations lack a proper basis.

The bankruptcy court concluded that (1) Citibank had not met its burden to have Lawrence's debt declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B); (2) Lawrence should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A); (3) certain transfers of property between Lawrence and Diana pursuant to a property settlement agreement were fraudulent conveyances and avoidable pursuant to 11 U.S.C. §§ 544 and 548; and, (4) Citibank had not received a preferential transfer pursuant to 11 U.S.C. § 547.

---

1. For ease of legibility this court refers to Mr. Williams as "Lawrence" and Ms. Williams as "Diana."

2. Diana testified that her year to date earnings through September 1983 were $213,000. An extrapolated estimate of her yearly salary would be approximately $283,000.

3. The parties submitted appendices to this court containing approximately 85 exhibits, however, several of the exhibits contained in the appendices were duplicative. Adding to this court's confusion is the bankruptcy court's exhibit sheet which lists only 45 exhibits as being introduced into evidence; three of which were noted as being duplicative.

### The Standard of Review

 In appeals from bankruptcy courts, the District Court sits as an intermediate appellate court. The district court reviews a bankruptcy court's findings of fact under a clearly erroneous standard while conclusions of law are subject to *de novo* review. *In re LaRoche,* 969 F.2d 1299 (1st Cir.1992). Due regard is given to the bankruptcy court's determination of the credibility of the witnesses. *In re The Bible Speaks,* 869 F.2d 628 (1st Cir.), *cert. denied,* 493 U.S. 816, 110 S.Ct. 67, 107 L.Ed.2d 34 (1989). "If the [bankruptcy] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 630. The decision of the bankruptcy court may be affirmed on any ground supported by the record. *In re Erin Food Services, Inc.,* 980 F.2d 792 (1st Cir.1992); *see also In re Hemingway Transport, Inc.,* 954 F.2d 1 (1st Cir.1992); *In re Parque Forestal, Inc.,* 949 F.2d 504 (1st Cir.1991).

### I.

### Alleged Factual Errors and the Misapplication of the Missing–Witness Inference

 Lawrence first contends that the bankruptcy court made seven erroneous factual findings. Lawrence avers that "[o]n virtually every crucial factual issue underlying the Court's decision on the Sections 727, 544, and 548 claims, the Bankruptcy Court misapplied the empty-chair doctrine to make erroneous findings from prejudicial inferences against the defendants." Lawrence contends that the bankruptcy court failed to make any of the necessary preliminary determinations before applying the missing-witness inference. Lawrence believes that if the bankruptcy court had made the proper preliminary determinations it would have concluded that the doctrine was inapplicable. Diana joins Lawrence in his contention that the

application of the missing-witness inference was error.

Citibank argues that the bankruptcy court did not commit error in its application of the missing-witness inference. Citibank avers that, in light of the bankruptcy court's credibility determinations with respect to both Lawrence and Diana, the court made the proper preliminary determinations necessary for the appropriate application of the doctrine. In the alternative, Citibank avers that any error which may have resulted from the misapplication of the missing-witness inference was harmless.

While acknowledging that neither party had asserted the attorney-client privilege during the trial, counsel for Citibank in his closing argument incorrectly argued that negative inferences could be drawn as a result of Lawrence's failure to call his matrimonial and bankruptcy attorneys, and Diana's failure to call her matrimonial attorney, to explain certain gaps in the testimony. In reviewing the bankruptcy court's decision, this court finds at least six separate instances in which the bankruptcy court applied the missing-witness inference and construed evidence against Lawrence, Diana, or both of them. *In re Williams,* 159 B.R. 648 (Bankr. D.R.I.1993).

 The rationale for the missing-witness inference or the empty-chair doctrine, as it is sometimes referred to, was announced in *Graves v. United States,* 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893). The *Graves* court stated that "if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would elucidate the transaction, the fact that he [or she] does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Id.* at 121, 14 S.Ct. at 41. The First Circuit has established three circumstances where a missing-witness inference is proper. *United States v. St. Michael's Credit Union,* 880 F.2d 579 (1st Cir.1989); *see also United States v. Ariza–Ibarra,* 651 F.2d 2 (1st Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981).[4] An adverse inference

---

**4.** The court notes that the parties cited many cases from foreign circuits dealing with the application of the missing-witness inference. For

reasons that are unclear to the court, the parties appeared to ignore controlling First Circuit case

may be drawn against a party toward whom the missing-witness is favorably disposed. *St. Michael's Credit Union,* 880 F.2d at 597. Additionally, a negative inference may be drawn where a party does not produce a material witness peculiarly within that party's control. *Id.* Finally, an adverse inference may also be drawn where a party having exclusive control over a witness who could provide relevant, noncumulative, testimony fails to produce that witness. *Id.* A missing-witness inference is not proper where there is no claim of the witness' favorable disposition towards the non-producing party and the witness is equally available to both parties. *Id.; see also Fleet National Bank v. Anchor Media Television, Inc.,* 831 F.Supp. 16 (D.R.I.1993), *aff'd,* 45 F.3d 546 (1st Cir.1995). The decision of whether or not to allow a missing-witness inference is within the sound discretion of the trial judge. *St. Michael's Credit Union,* 880 F.2d at 597.

The transcript reflects that the uncalled attorney witnesses were equally available to all parties. There were many instances during the trial where the parties testified freely regarding conversations with their respective matrimonial counsel. Additionally, the following colloquy occurred during closing argument by counsel for Citibank:

"The Court: Well, throughout, you know, the attorney/client privilege has been invoked. Now—

"[Citibank]: Not here. We had—they talked freely about—there's a lot of testimony about the conversation between Mr. Williams and [his matrimonial attorney], Mrs. Williams, and [her matrimonial attorney] relating to what was being negotiated. It was not invoked here. We did—it was invoked you recall in the discovery process. It was never invoked here. ... Everybody talked about it, about what went on. There was no objection in this courtroom on the basis of attorney/client privilege, not once. So I ask you, why would you need—

"The Court: Is that true of the parties waiving the attorney/client privilege here?

. . . . .

law on the doctrine's application. This court is

"[Lawrence]: We let everybody testify. Sure.

"[Citibank]: An I'd also point out, Your Honor—

"The Court: Well, maybe, you know, if that's the case, I must say that I misunderstood the position. Maybe the case isn't over. Maybe I'll call [Lawrence's matrimonial attorney.]

"[Diana]: Your Honor, I just point out that [Citibank] listed [Lawrence's matrimonial attorney] as one of [their] witnesses.

"[Lawrence]: [Their] witness.

"[Citibank]: Yes. But, you know, I did not call.

"The Court: Well, I didn't, you know, get to [sic] excited about that because I probably incorrectly assumed that the minute you asked him more than his name that there would have been an objection.

"[Lawrence]: Well, to be honest with you, Judge, I mean, early on in the case, I think, we basically said go ahead, let— you know, let the testimony come in as to what lawyers were telling people. We never blocked any of it at any point in this case.

"[Citibank]: There was early blockage in the depositions.

"[Lawrence]: No. At 2004 Exam.

"[Citibank]: The 2004.

"[Lawrence]: Before this case was ever filed. Never in this case.

. . . . .

"The Court: No. That's about it. I just want to confirm for my own understanding that we do not have an attorney client privilege issue in this case or—

"[Citibank]: I do not believe so, Judge.

"[Diana]: I don't believe that and I haven't understood that during the trial of this case.

"The Court: Okay. I confess that I was always under the impression that it was out there and that you were letting each other go a certain distance and then

bound by the case law from the First Circuit.

each of you knew where to stop, I guess. That was incorrect." Transcript of January 29, 1993 at 216–220.

The record is quite clear that all three parties agreed that the attorney-client privilege had been waived. Diana's matrimonial counsel was also her counsel at the bankruptcy hearing and during his closing argument he stated:

> "Judge, I'm really amazed to hear [Citibank] say that the fact that I didn't testify and [Lawrence's matrimonial attorney] didn't testify should give rise to an inference against our respective clients. My deposition was taken at some length. I believe that [Lawrence's matrimonial attorney's] deposition was also taken at some length. I provided and [Lawrence's matrimonial attorney] provided complete drafts of prior property settlement agreements to [Citibank].... Included on those drafts are my notes for revisions and [Lawrence's matrimonial attorney's] notes for revisions." *Id.* at 220.

Furthermore, during trial, in response to a question from the bankruptcy judge specifically dealing with the differences between the first and the final drafts of the property settlement agreement, Diana's attorney explained the outcome of the property settlement negotiations. It is apparent from the record that the "missing-witness" attorneys were equally available to all parties.

 First Circuit case law is clear that where a witness is equally available to all parties and not shown to be favorably disposed toward the non-producing party, an adverse inference may not be drawn for failure to call that witness. *St. Michael's Credit Union,* 880 F.2d at 597. Citibank has failed to produce any evidence that the missing-witness attorneys were "clearly favorably disposed" to the non-producing parties. *See United States v. Spinosa,* 982 F.2d 620, 632 (1st Cir.1992); *United States v. Johnson,* 467 F.2d 804, 809 (1st Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973). The existence of an attorney-client relationship alone does not imply that the attorneys were clearly favorably disposed to the positions of their past or present clients. While counsel for Citibank acknowledged that the alleged missing witnesses were available to all parties, he inexplicably invited the bankruptcy judge to commit error by arguing that the court draw the adverse inference from Lawrence and Diana's failure to call their matrimonial attorneys as witnesses.

 Citibank argues that, even if the application of the missing-witness inference was error, any error in misapplying the doctrine must be harmless because there are sufficient untainted facts to support the bankruptcy court's conclusions. While it appears that many of the bankruptcy court's findings rest on solid ground, several statements in the decision give this court pause and reason to believe that the improperly drawn adverse inferences weighed heavily in many critical factual determinations which serve as the underpinnings of the court's legal conclusions.

For example, in commenting on Lawrence and Diana's failure to call their matrimonial attorneys to testify regarding the reasons giving rise to the property settlement agreement, the court stated

> "[w]e find this to be a *crucial void* in the record and can *only* conclude that such testimony, if presented, would have been unfavorable to them, and would in many respects contradict the testimony of Larry and Diana Williams." *In re Williams,* 159 B.R. at 657 n. 16 (emphasis added).

In another reference to Lawrence and Diana's failure to call their matrimonial attorneys, the court found that had either Lawrence or Diana's matrimonial attorneys testified

> "as to the negotiations that must have taken place, and why the result was deemed reasonable, *we might at least have had the opportunity to reach a different conclusion.* However, neither one appeared, and we conclude that their testimony would have been unfavorable to the interests of their clients in this litigation." *Id.* at 660 (emphasis added).

After drawing this conclusion the court found that

> "[t]his strategy was kept under such tight security that we still don't know what really went on, even after a six day trial.

Larry and Diana Williams are not talking, and the attorneys with the first hand knowledge were kept out of court—their lips also sealed on this issue." *Id.* at 662 n. 28.

Having reviewed the bankruptcy court's decision, it is clear that the bankruptcy judge drew adverse inferences as a result of his misapplication of the missing-witness doctrine. It is also clear from the passages of the bankruptcy court's decision recounted above, that those inferences factored significantly into the bankruptcy court's factual determinations and its legal conclusions. What is not clear to this court, however, is just how pivotal those tainted findings were in the bankruptcy court's arrival at its ultimate conclusions. Because those inferences and the findings of fact which flow from them are so inextricably intertwined, this court is unable to separate the wheat from the chaff.

 Therefore, a remand to the bankruptcy court for reconsideration of its decision in light of this opinion is in order. Since the misapplication of the missing-witness inference permeated the bankruptcy court's decisions on the §§ 544, 548 and 727 claims, they are remanded to the bankruptcy court for its reconsideration in light of this decision.[5]

## IV.

### § 547 Preference Claim

 Lawrence asserts that the bankruptcy judge improperly ruled that he had not met his burden of proof under his § 547 preference claim. Lawrence avers that the payment to Citibank pursuant to the Davidge sale agreement was a preference and consequently should have been included in the bankrupt estate. Lawrence contends that the bankruptcy judge made an earlier ruling regarding another preference item and contends that the law of the case doctrine mandated that the bankruptcy judge rule that

the payment for the sale of Davidge was also a preference.

Citibank contends that the bankruptcy court did not make any ruling with regard to the first preference question and consequently would not be bound by the law of the case doctrine. Citibank also avers that Lawrence presented no evidence in support of which part of the payment was secured and which part of the payment was unsecured. Citibank concludes that by failing to present such proof Lawrence "failed to carry his burden and show that any percentage of the funds received is attributable to anything but Citibank's secured claim."

The bankruptcy judge held that Lawrence failed to prove that Citibank received more from the Davidge payment than it would have received in a bankruptcy liquidation. *In re Williams,* 159 B.R. at 664. In fact, the bankruptcy judge found that Lawrence's only support for his argument that Citibank improved its position as a creditor was the proposed negative financial impact of the Internal Revenue Service (IRS) claim. *Id.* The bankruptcy judge concluded that because Lawrence was "aggressively contest[ing]" the IRS claim in a separate court action, the "evidence is insufficient … to conclude, as a matter of law, that this claim will result in no funds being available for Citibank." *Id.* Furthermore, the bankruptcy court stated that it would be "speculation to conclude that, because of a disputed IRS claim, Citibank received more by these transfers that it would have received in [bankruptcy] liquidation." *Id.*

Lawrence first claims that as a result of the implications of the law of the case doctrine the bankruptcy court erroneously held that the payment of the Davidge funds was not a preference. Originally, Lawrence had two preference claims against Citibank. The first claim related to a prejudgment attachment on Wyndham that Citibank had obtained in state court. Lawrence avers that the bankruptcy court found, and Citibank

---

**5.** This court is aware that *In re Erin Foods, In re Hemingway Transport,* and *In re Parque Forestal* all stand for the proposition that this court may affirm the bankruptcy court's decision on *any* ground supported by the record. The true difficulty with an affirmance based upon any ground

found in this record is that this court would have to conduct its own fact finding from its reading of the transcript. Consequently, this court would be "redeciding" the case, an exercise which this court believes goes beyond *In re Erin Foods, In re Hemingway Transport,* and *In re Parque Forestal.*

agreed, that the November 1990 pre-judgment attachment on Wyndham was a preference.

Lawrence contends that because the bankruptcy judge had already conceded that the state court prejudgment attachment was a preference, he consequently also determined that Citibank received more by the transfer than it would have received in Chapter 7 liquidation. Lawrence now argues that because the judge had already ruled that Citibank improved its position as a creditor with respect to the first preference claim he was bound by this ruling in his analysis of the Davidge payment.

 A "preference" is a transfer of a debtor's assets during a specified pre-bankruptcy period that unjustifiably favors the transferee over other creditors. *In re Melon Produce, Inc.*, 976 F.2d 71 (1st Cir.1992). The burden of proof in a matter concerning an allegedly voidable preference is upon the debtor in possession to show each element of the claim by a preponderance of the evidence. *In re Ralar Distributors, Inc. v. Rubbermaid, Inc.*, 4 F.3d 62 (1st Cir.1993); *see also Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573 (1st Cir.1980). The pertinent section of 11 U.S.C. § 547 provides that

"the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more that such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

The portion of the bankruptcy judge's ruling that Lawrence now appeals deals with § 547(5). Subject to certain limitations not pertinent to this appeal, a debtor in possession has all of the titles and powers of a trustee. *See* 11 U.S.C. § 1107.

 " 'As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)); *see also Abbadessa v. Moore Business Forms, Inc.*, 987 F.2d 18 (1st Cir.1993). The law of the case revolves around whether a court previously "decide[d] upon a rule of law." *Christianson*, 486 U.S. at 817, 108 S.Ct. at 2178. The doctrine only applies to issues actually decided or decided by necessary implication. *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453 (1st Cir.1992). "[A] court need not adopt as 'law of the case' a proposition that was merely assumed, rather than decided." *Id.* at 463. The law of the case doctrine does not limit a tribunal's power; it directs its discretion. *Southern Ry. Co. v. Clift*, 260 U.S. 316, 43 S.Ct. 126, 67 L.Ed. 283 (1922). The doctrine expresses the theory that courts should not revisit what has already been decided. *Messinger v. Anderson*, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). The doctrine is not wholly inflexible however and can be abrogated in "unusual circumstances." *Abbadessa*, 987 F.2d at 22. "In other words, because the law of the case doctrine is a rule of policy and practice, rather than a jurisdictional limitation, it may tolerate a 'modicum of residual flexibility' in exceptional circumstances." *United States v. Bell*, 988 F.2d 247, 251 (1st Cir.1993) (quoting *United States v. Rivera–Martinez*, 931 F.2d 148, 151 (1st

Cir.), *cert. denied,* 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991)).

Lawrence points to a short passage in the record that he avers supports his position that the bankruptcy judge ruled that the prejudgment real estate attachment was a preference. The colloquy, occurring during closing argument, is at best ambiguous. During Lawrence's counsel's closing argument the following exchange occurred:

> "The Court: Before you leave the—what do you say about this attachment preference? It's on proceeds now, right?
>
> "[Citibank]: I guess it just attaches to the net proceeds now.
>
> "[Lawrence]: Yeah. I wouldn't dispute that attachment to the proceeds.
>
> "[Citibank]: To the proceeds.
>
> "The Court: Yeah. What's your position on that? Are you hanging on to that?
>
> "[Citibank]: I'll have to go back and look at my brief. I don't have my brief with me. I mean, it's just a question of law, but we will admit the facts. It was—we liened the property within ninety days of filing. If it's a preference, it's a preference.
>
> "The Court: I think it's a preference.
>
> "[Lawrence]: I'll submit an order.

> . . . . .

> "The Court: Okay. *For right now, I think it a preference.* You may present an order of [sic] something." Transcript of January 29, 1993 at 198–199.

This was not a clear order or finding of a court; in fact it was temporally limited. Consequently, the first preference issue was never ruled upon by the judge. The doctrine applies only to issues actually decided or decided by implication. *See Dedham Water Co.,* 972 F.2d 453 (1st Cir.1992). Lawrence never presented the bankruptcy judge with an order, consequently this court does not have a clear ruling upon that issue by the trial judge.

This court refuses to find that the cryptic language cited by Lawrence is a ruling in which the law of the case doctrine was meant to apply. Because this court holds that the issue of whether Citibank received more than

it would have received in a bankruptcy liquidation under the first preference claim was never decided by the bankruptcy court, the law of the case doctrine does not apply and this court is not precluded from considering the preference question at this stage in the litigation. *See generally Abbadessa v. Moore Business Forms,* 987 F.2d 18 (1st Cir.1993).

██ Notwithstanding his "law of the case" argument, Lawrence avers that the bankruptcy court erred in its § 547 ruling because the IRS had filed a proof of claim in the amount of $6,569,754.42, and that amount far exceeded Lawrence's assets at the time of the bankruptcy filing. Lawrence concludes that "[i]t was unlikely that any of [his] general unsecured creditors, including the Bank, would have received any distribution" because of the large amount of the IRS claim.

██ "A proof of claim which comports with the requirements of Bankruptcy Rule 3001(f) constitutes prima facie evidence of the validity and the amount of the claim." *In re Hemingway Transport, Inc.,* 993 F.2d 915, 925 (1st Cir.); *cert. denied,* —— U.S. ——, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993); *see also* Fed.R.Bankr.P. 3001(f). "The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by substantial evidence." *Hemingway,* 993 F.2d at 925.

The bankruptcy court concluded that Lawrence was aggressively contesting the IRS claim, and that the claim had been characterized by Lawrence's tax attorney as not having "much merit." *In re Williams,* 159 B.R. at 664. There were two instances during the trial where the IRS claim was discussed. During re-cross examination of Galli the following colloquy occurred:

> "[Lawrence]: It's a case brought by Mr. Williams against the Internal Revenue Service who, in fact, determined these claims.
>
> "The Court: Yeah. And do we have—do I recall an opinion by Mr. Williams' tax lawyer that he thinks that the estate of Mr. Williams is in good shape now.
>
> "[Lawrence]: Well, you don't remember that in this case, Your Honor.

"The Court: Correct. Well, you said it. You mean, I'm not—should I not know that? I mean, I—I don't know. Maybe I should disqualify myself at this point, but—

. . . . .

"[Lawrence]: I understand, Your Honor, it's hard to—but I think in all due fairness that anything that you hear regarding Mr. Williams that you have not heard in the context of the evidence in this case is not something that you can consider.

"The Court: Well, I heard it. I remember it. If it's evidence that I should strike from my mind, then it's not in evidence. Okay.

. . . . .

Additionally, during Lawrence's counsel's closing argument the following colloquy occurred:

"The Court: What am I supposed to do with the argument that Mr. Williams doesn't owe any taxes?

"[Lawrence]: Well, who can argue that he doesn't owe any taxes?

"The Court: I mean, I understand that as an advocate—

"[Lawrence]: We don't even argue that he doesn't owe any taxes.

"The Court: —argue alternatively, but—

"[Lawrence]: Who argues that he doesn't owe any taxes? Them?

"The Court: No. That's not Mr. Williams' position?

. . . . .

"The Court: I mean, everything isn't a two-edged sword. I do owe taxes for this purpose. I don't owe it for another, you know, and for—

"[Lawrence]: You know, I guess, Your Honor, I will say—

"The Court: —real.

"[Lawrence]: —this, I think it's a dangerous proposition and we've mentioned this before. I think—

"The Court: I think you're wrong on that, but I'll hear your argument. I think the whole file is available to me and every-

thing that's happened in this case since it opened up, but I'm subject to—

"[Lawrence]: Well, I—you know, I guess maybe the file, Your Honor, I suppose, I mean—

. . . . .

"[Lawrence]: You know, I don't like it if Your Honor says, "well, somebody said something in another part of this case and—"

"The Court: That's not what I'm telling you.

. . . . .

"The Court: Somebody told me something in this case and I think it's fair game. Okay.

"[Lawrence]: Okay. I just want to know what it is so I can respond to it, Your Honor. I mean, do you understand? I mean, I know what—I know—

"The Court: *I'll stand corrected if Mr. Williams' tax lawyer didn't say that he thought there was a likelihood of what I remember as a very good result which I understood to mean that there was not going to be any tax due.*"

. . . . .

"[Lawrence]: I would be very surprised. I'm almost positive that Mr. Stine never said that. Could he have said something about—you understand what favorable result is, Judge. Okay. When you're being assessed for two million dollars, what's a favorable result?" Transcript of January 29, 1993, 188–90 (emphasis added).

The trial judge did not make any specific fact findings with regard to the status of the IRS claim. The foregoing transcript references to the IRS claim are all of the information that this court has before it regarding the tax claim. This court cannot rest a decision upon such limited information. It appears that the bankruptcy judge based his decision on some other information not contained in the record before this court. This court is without sufficient information to properly review the status and viability of the IRS claim and its effect, if any, on this action. This court concludes that the issue of

the § 547 preference claim must be remanded to the bankruptcy court for further findings regarding the status, effect and interplay, if any, of the IRS claim.

Additionally the bankruptcy court held that Lawrence had failed to carry his burden, pursuant to § 547(b)(5), of identifying what percentage of the Davidge funds pertained to payment for Lawrence's personal services (the unsecured portion of the payment) and what percentage of the funds pertained to payment for the sale of Davidge's client lists (the secured portion of the payment). *In re Williams*, 159 B.R. at 664. The bankruptcy court found that

> "with respect to the sale of any of Davidge's clients or client lists, that Citibank's security interest in the Davidge stock would extend to those assets. However, [the court does] not agree that Citibank's security interest also extends to the services rendered by Williams in coordinating the sale of assets, or in agreeing to a noncompetition agreement. Thus, it would seem that, at most, Citibank's secured interest only extends to an undivided portion of the assignment proceeds, and no evidence has been offered to establish what that percentage might be." *Id.*

It appears, however, that the record does contain some evidence of the percentage provided for in the agreement. The Davidge sales agreement, identified as trial exhibit number 24 and a part of the record on appeal, specifically states that

> "Davidge & Company would be paid 10% of the total amount due, in light of our understanding that Davidge was terminating its investment management business in any event. *You would be paid 90% of the total amount due in consideration of your ongoing services and noncompetition agreement.* ... We acknowledge that all fees to be paid you and Davidge & Company hereunder have been assigned to Citibank ...." Trial exhibit 24 (emphasis added.)

Additionally, trial exhibit number 84[6], an internal memorandum from Fiduciary which computed the final payment for the Davidge purchase to be $118,117.29, further broke down the payment according to the 90–10 split to be

| | |
|---|---|
| "Davidge & Company | $ 11,811.73 |
| Lawrence G. Williams | 106,305.53 |
| | $118,117.25. "[7] |

These exhibits would appear to be inconsistent with Citibank's position and the bankruptcy court's findings that no evidence had been offered regarding what percentage pertained to payment for Davidge's client list and its stock as compared to payment for Williams' personal services and his non-compete agreement.

This court believes that the § 547 issue should be remanded to the bankruptcy court for further proceedings with respect to the IRS claim and for a determination of what effect, if any, it has on this proceeding. Additionally, the bankruptcy court may, if it deems it necessary, investigate trial exhibits 24 and 84 and determine if they effect the § 547 analysis.

For the reasons stated herein, the bankruptcy court's decision is remanded for further consideration consistent with this opinion.

---

**6.** Trial exhibit number 84 was a part of the record on appeal, however it does not appear on the "U.S. Bankruptcy Court Exhibit Sheet."

**7.** There is an error in addition of one cent, the total should be $118,117.26.